699 So.2d 1312 (1997)
Leonardo FRANQUI, Appellant,
v.
STATE of Florida, Appellee.
No. 83116.
Supreme Court of Florida.
June 26, 1997.
Rehearing Denied October 6, 1997.
*1315 Eric M. Cohen, Miami, for Appellant.
Robert A. Butterworth, Attorney General; and Fariba N. Komeily and Randall Sutton, Assistant Attorneys General, Miami, for Appellee.
PER CURIAM.
We have on appeal the judgment of the trial court adjudicating the appellant, Leonardo Franqui, guilty of first-degree murder and other crimes, as well as its imposition of the death penalty. We have jurisdiction under article V, section 3(b)(1), of the Florida Constitution. Although we find error in the admission of evidence in violation of the United States Constitution, we find the error harmless and affirm Franqui's convictions and sentences.

I. TRIAL COURT PROCEEDINGS
Leonardo Franqui and codefendants Pablo San Martin and Pablo Abreu were charged with one count of first-degree murder, two counts of attempted first-degree murder with a firearm, one count of attempted robbery with a firearm, two counts of grand theft, and one count of unlawful possession of a firearm while engaged in a criminal offense. Prior to trial, codefendant Abreu negotiated a plea with the State and subsequently testified against Franqui during the penalty phase of the proceedings.
The following facts were established at the trial of Franqui and San Martin. Danilo Cabanas, Sr., and his son, Danilo Cabanas, Jr., operated a check-cashing business in Medley, Florida. On Fridays, Cabanas Sr. would pick up cash from his bank for the business. After Cabanas Sr. was robbed during a bank trip, Cabanas Jr. and a friend, Raul Lopez, regularly accompanied Cabanas Sr. to the bank. The Cabanases were each armed with a 9mm handgun, and Lopez was armed with a .32 caliber gun.
On Friday, December 6, 1991, the Cabanases and Lopez drove in separate vehicles to the bank. Cabanas Sr. withdrew about $25,000 in cash and returned to the Chevrolet Blazer driven by his son. Lopez followed in his Ford pickup truck. Shortly thereafter, the Cabanases were cut off and "boxed in" at an intersection by two Chevrolet Suburbans. Two occupants of the front Suburban, wearing masks, got out and began shooting at the *1316 Cabanases. When Cabanas Sr. returned fire, the assailants returned to their vehicle and fled. Cabanas Jr. saw one person, also masked, exit the rear Suburban.
Following the gunfight, Lopez was found outside his vehicle with a bullet wound in his chest. He died at a hospital shortly thereafter. One bullet hole was found in the passenger door of Lopez's pickup. The Suburbans, subsequently determined to have been stolen, were found abandoned. Both Suburbans suffered bullet damageone was riddled with thirteen bullet holes. The Cabanases' Blazer had ten bullet holes.
Franqui's confession was admitted at trial. When police initially questioned Franqui, he denied any knowledge of the Lopez shooting. However, when confronted with photographs of the bank and the Suburbans, he confessed. Franqui explained that he had learned from Fernando Fernandez about the Cabanases' check cashing business and that for three to five months he and his codefendants had planned to rob the Cabanases. He described the use of the stolen Suburbans, the firearms used, and other details of the plan. Franqui admitted that he had a .357 or .38 revolver. Codefendant San Martin had a 9mm semiautomatic, which at times jammed, and codefendant Abreu had a Tech-9 9mm semiautomatic, which resembles a small machine gun. Franqui stated that San Martin and Abreu drove in front of the Cabanases and Franqui pulled alongside them so they could not escape. Once the gunfight began, Franqui claimed that the pickup rammed the Cabanases' Blazer and Lopez opened fire. Franqui then returned fire in Lopez's direction.
San Martin refused to sign a formal written statement to police. However, San Martin orally confessed and, in addition to relating his own role in the incident, detailed Franqui's role in the planning and execution of the crime. San Martin admitted initiating the robbery attempt and shooting at the Blazer but not shooting at Lopez's pickup. He placed Franqui in proximity to Lopez's pickup, although he could not tell if Franqui had fired his gun during the incident. San Martin initially claimed that the weapons used in the crime were thrown off a Miami Beach bridge, but subsequently stated that he had thrown the weapons into a river near his home, where they were later recovered by the police. San Martin did not testify at trial, but his oral confession was admitted into evidence over Franqui's objection.
A firearms expert testified that the bullet recovered from Lopez's body was consistent with the .357 revolver used by Franqui during the attempted robbery. He said the same about a bullet recovered from the passenger mirror of one of the Suburbans and a bullet found in the hood of the Blazer. The rust on the .357, however, prevented him from ruling out the possibility that the bullets may have been fired from another .357 revolver.
The jury found Franqui guilty as charged and recommended the death penalty for the first-degree murder conviction by a nine-to-three vote. The trial court followed the jury's recommendation and found four aggravators: (1) prior violent felony convictions, see § 921.141(5)(b), Fla. Stat. (1995); (2) murder committed during the course of an attempted robbery, see id. § 921.141(5)(d); (3) murder committed for pecuniary gain, see id. § 921.141(5)(f); and (4) murder committed in a cold, calculated, and premeditated manner. See id. § 921.141(5)(i). The court found no statutory mitigating circumstances and two non-statutory mitigating circumstances: (1) Franqui had a poor family background and deprived childhood, including abandonment by his mother, the death of his mother, and being raised by a man who was a drug addict and alcoholic; and (2) Franqui was a caring husband, father, brother, and provider. The court sentenced Franqui to death on the first-degree murder charge; life imprisonment on the two attempted murder charges; fifteen years imprisonment on the attempted robbery and second grand theft charge; and five years imprisonment on the first grand theft charge and unlawful firearm possession charge. All sentences were ordered to run consecutively.

II. LAW & ANALYSIS ON APPEAL

Corpus Delicti
We reject Franqui's claim that the trial court erred in failing to exclude Franqui's *1317 own confession from evidence because the State did not first present sufficient evidence of corpus delicti. The phrase "corpus delicti" means "body of the crime," Black's Law Dictionary 344 (6th ed.1990), and refers generally to the proof that a crime has been committed. Florida law requires that the corpus delicti be established independently of any confession before the confession is admitted into evidence. Bassett v. State, 449 So.2d 803 (Fla.1984); Frazier v. State, 107 So.2d 16 (Fla.1958). In order to prove corpus delicti, the State must establish: (1) that a crime of the type charged was committed; and (2) that the crime was committed through the criminal agency of another. State v. Allen, 335 So.2d 823, 825 (Fla.1976). In regard to the first partthat a crime was committedeach element of the relevant offense must be shown to exist. Burks v. State, 613 So.2d 441, 443 (Fla.1993). With respect to the second partthe criminal agency of anotherthe proof need not show the specific identity of the person who committed the crime. Id. That is, it is not necessary to prove that the crime was committed by the defendant.
In order to prove attempted armed robbery, the State must show: (1) the formation of an intent to commit the crime of robbery; (2) the commission of some physical act in furtherance of the robbery; and (3) the use of a firearm. See §§ 777.04(1), 812.13(2)(a), Fla. Stat. (1993); Cooper v. Wainwright, 308 So.2d 182, 184 (Fla. 4th DCA), cert. dismissed, 312 So.2d 761 (Fla. 1975). In this context, intent may be proved by considering the conduct of the accused and his colleagues before, during, and after the alleged attempt along with any other relevant circumstances. Cooper, 308 So.2d at 185.
Here, the Cabanases' testimony established that they departed the bank, as they did every Friday, with a large sum of money$25,000 in cash. A short distance from the bank, a Suburban stopped in front of them. A second Suburban pulled alongside them at a high rate of speed and also stopped, foreclosing an escape. Two masked men emerged from the front Suburban and immediately opened fire at the Cabanases. One person, possibly armed, and also masked, exited the rear Suburban. The victims returned fire and the attackers fled. The two Suburbans, subsequently determined to be stolen, were found nearby, abandoned beside an expressway.
We find that the evidence in this case is sufficient to establish that the attackers did intend a robbery, did some physical act which was intended to accomplish the commission of this crime, and unlawfully used a firearm during the commission of a felony. We find that the corpus delicti of the crimes was shown independently of the confession. We therefore conclude that the trial court did not err in failing to exclude portions of Franqui's confession.

San Martin's Statement
Franqui also asserts that the trial court erred by admitting into evidence at their joint trial codefendant San Martin's confession incriminating Franqui and by denying his motion to have his trial severed from that of San Martin. Specifically, he argues that the trial court's failure to grant a severance violated his federal constitutional right to confront San Martin, who did not testify at their joint trial, as to those portions of San Martin's confession admitted at trial which incriminated Franqui in the crime and in the shooting death of Lopez.
While the issue which Franqui raises on appeal is the denial of the motion to sever the codefendants' cases, the admissibility of the codefendant's confession is a subissue within this issue. Franqui argued that he was prejudiced by having a joint trial with San Martin in which San Martin's verbal confession was admitted as direct evidence against Franqui. Franqui's argument was that because San Martin's verbal confession was not sufficiently interlocking with Franqui's own confession, San Martin's confession failed to meet the indicia of reliability required by the United States Supreme Court in Lee v. Illinois, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986), as interpreted by the same Court in Cruz v. New York, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987). In opposition, the State argued that *1318 the two confessions did sufficiently interlock to provide that indicia of reliability.
In Lee, the Court confronted the situation in which the trier of fact used a codefendant's confession as substantive evidence against the defendant when the defendant's own confession also was admitted into evidence. The Lee court stated that the issue before it was "whether [the] substantive use of the hearsay confession denied Petitioner [Lee] rights guaranteed her under the Confrontation Clause." Lee, 476 U.S. at 539, 106 S.Ct. at 2061 (quoting respondent's brief at 11). In holding that the codefendant's confession did not bear sufficient indicia of reliability to be directly admissible under the Confrontation Clause, the Court rejected the State's argument that because the two confessions interlocked on some points, the codefendant's confession was reliable. Id. at 545, 106 S.Ct. at 2064. The Court stated:
If those portions of the codefendant's purportedly "interlocking" statement which bear to any significant degree on the defendant's participation in the crime are not thoroughly substantiated by the defendant's own confession, the admission of the statement poses too serious a threat to the accuracy of the verdict to be countenanced by the Sixth Amendment. In other words, when the discrepancies between the statements are not insignificant, the codefendant's confession may not be admitted.

Id. (emphasis added).
The Cruz Court held that the giving of a limiting instruction cannot cure the Confrontation Clause violation resulting from the admission of a codefendant's interlocking confession which implicates the other defendant in the crime even in cases in which the defendant's own confession is properly before the jury. Cruz, 481 U.S. at 191-92, 107 S.Ct. at 1718-19. The Court reasoned that the codefendant's confession which implicated the defendant was all the more harmful to the defendant if it interlocked with the defendant's own confession. Notwithstanding, the Court also stated:
Of course, the defendant's confession may be considered at trial in assessing whether his codefendant's statements are supported by sufficient "indicia of reliability" to be directly admissible against him (assuming the "unavailability" of the codefendant) despite the lack of opportunity for cross-examination, see Lee ....
Id. at 193-94, 107 S.Ct. at 1719-20. Thus, the citation in Cruz to Lee appeared to suggest the possibility that a codefendant's confession still may be admitted under some circumstances as direct evidence against a defendant upon a showing of sufficient indicia of reliability resulting from the interlocking nature of the confessions. Lee, 476 U.S. at 545, 106 S.Ct. at 2064.
It was upon this analysis of Cruz that we held in Grossman v. State, 525 So.2d 833, 838 (Fla.1988):
Taylor's [the codefendant's] statement interlocks with and is fully consistent in all significant aspects with all three statements that [defendant] made to Hancock, Allen, and Brewer and which were directly admissible against [defendant]. The indicia of reliability are sufficient to have permitted introduction of Taylor's statement as evidence against [defendant].
However, in 1990 the United States Supreme Court modified its earlier indicia of reliability analysis and held that to be admissible under the Confrontation Clause, hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness rather than by reference to other evidence introduced at trial. Idaho v. Wright, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990).
In Wright, the Court addressed the issue of whether admission of certain hearsay statements made by a child declarant to an examining pediatrician violated the Confrontation Clause. The Court found that to be admissible under the Confrontation Clause, the hearsay statements must possess sufficient indicia of reliability from either their admission through a firmly rooted exception or by a showing of particularized guarantees of trustworthiness. Id. at 816, 110 S.Ct. at 3147 (quoting Ohio v. Roberts, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980)). In determining what constitutes such a showing, the Court held that the relevant circumstances only include those *1319 that surround the making of the statement and those that render the declarant worthy of belief. Wright, 497 U.S. at 819, 110 S.Ct. at 3148. The Court observed that the presence of corroborating evidence would more appropriately indicate that the error in admitting the statement was harmless than provide a basis for presuming the declarant to be trustworthy. Justice Kennedy, writing for the four dissenting justices, pointed out how the majority opinion had altered the rationale of Lee and Cruz.
In any event, the bottom line of Wright is that the interlocking nature of the confessions cannot provide a basis upon which to determine whether there are sufficient indicia of reliability to introduce the codefendant's hearsay confession as substantive evidence of the defendant's guilt. Wright's impact on this case is obvious because it was the interlocking nature of the confession which prompted the trial court to conclude that San Martin's confession had sufficient indicia of reliability to overcome the presumption of unreliability which attaches to accomplices' hearsay confessions that incriminate the defendant. Lee, 476 U.S. at 541, 106 S.Ct. at 2062.
Having determined that the interlocking nature of the confessions did not provide sufficient indicia of reliability to avoid the Confrontation Clause, we proceed to the question of whether San Martin's confession possesses inherent trustworthiness to be directly admissible on another basis. In Wright, the Court gave the following guidance:
We think the "particularized guarantees of trustworthiness" required for admission under the Confrontation Clause must likewise be drawn from the totality of circumstances that surround the making of the statement and that render the declarant particularly worthy of belief. Our precedents have recognized that statements admitted under a "firmly rooted" hearsay exception are so trustworthy that adversarial testing would add little to their reliability. Wright, 497 U.S. at 820-21, 110 S.Ct. at 3149-50. Thus, the question of the admissibility of San Martin's confession against Franqui becomes whether San Martin's confession comes within a firmly-rooted hearsay exception or whether the totality of the circumstances in which San Martin's confession was made makes the statement inherently trustworthy and renders the declarant particularly worthy of belief.
While a statement against penal interest is an exception to the hearsay rule under section 90.804(2)(c), Florida Statutes (1995), we cannot say that it is a firmly rooted exception. Prior to the adoption of the Evidence Code, this Court first recognized the statement-against-penal-interest exception in Baker v. State, 336 So.2d 364 (Fla.1976).[1] The exception was thereafter codified as section 90.804(2)(c), and included the following sentence: "A statement or confession which is offered against the accused in a criminal action, and which is made by a co-defendant or other person implicating both himself and the accused, is not within this exception." See also Nelson v. State, 490 So.2d 32 (Fla.1986). However, in 1990, the legislature deleted this sentence, thereby allowing for the admission of self-inculpatory statements of nontestifying codefendants. See generally Charles W. Ehrhardt, Florida Evidence § 804.4 (1995). Since that section of the Evidence Code specifically excluded such a statement as being an exception to the hearsay rule until 1990, See Nelson, this exception is not firmly rooted. Finally, we cannot say that the totality of the circumstances under which San Martin made his confession demonstrated the particularized guarantee of trustworthiness sufficient to overcome the presumption of unreliability of a codefendant's statement which implicates the defendant.
Moreover, our analysis of the decisions of the United States Supreme Court now requires us to recede from that portion of Grossman which relied upon the interlocking nature of the confession to provide the requisite *1320 indicia of reliability. For the same reason, we also recede from that portion of Farina v. State, 679 So.2d 1151 (Fla.1996), in which we indicated that the defendant's confession could be considered in assessing whether a codefendant's statements are supported by sufficient indicia of reliability. Id. at 1155. However, in Farina, because the defendant and the codefendant discussed the crime with each other, that case is a unique example of when a codefendant's statements, although implicating the defendant, had a particularized guarantee of trustworthiness so as to be introduced against him based solely upon the circumstances under which the statements were made. See also Puiatti v. State, 521 So.2d 1106 (Fla.1988) (reliability clearly established by joint confession).
San Martin was interviewed a second time after his arrest by Detective Albert Nabut. San Martin's statement to Detective Nabut was also admitted against Franqui at their joint trial. In this instance, the statement was essentially limited to San Martin's actions in disposing of the weapons used in the crime which further implicated him in the crime and his efforts to destroy evidence connecting him to the crime. He made no reference to Franqui in this statement.
The decision of the United States Supreme Court in Williamson v. United States, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994), is instructive with respect to whether San Martin's statement to Detective Nabut was admissible. In Williamson, the Court clarified the scope of the hearsay exception for statements against penal interest, see Fed R.Evid. 804(b)(3), in determining the admissibility of an accomplice's confession. The Court narrowly construed this exception to the hearsay rule and found only the self-inculpatory portions of the statement contained within the confession would be admissible. Id. at 602-03, 114 S.Ct. at 2436-37.
While Williamson dealt with a hearsay question and the instant case deals with a Confrontation Clause objection, Williamson is significant for the purpose of this discussion because it naturally follows that if the self-inculpatory portions of an accomplice's confession meet this hearsay exception, then these portions can be found to have sufficient inherent trustworthiness to also meet the test of admissibility under the Confrontation Clause as announced in Wright. The Court in Williamson stated that "[e]ven the confessions of arrested accomplices may be admissible if they are truly self-inculpatory, rather than merely attempts to shift blame or curry favor." Williamson, 512 U.S. at 603, 114 S.Ct. at 2436. Similarly, Justices O'Connor and Scalia directly recognized in Williamson that the very fact that a statement is genuinely self-inculpatory is itself a particularized guarantee of trustworthiness that makes a statement admissible under the Confrontation Clause. Williamson, 512 U.S. at 605, 114 S.Ct. at 2437-38 (plurality opinion of O'Connor, J.) (citing Lee v. Illinois).[2]
Accordingly, we hold that the substance of San Martin's interview with Detective Nabut concerning the whereabouts of the weapons used in the crime was admissible because it was individually self-incriminatory. While the weapons recovered provided the State with additional evidence against Franqui, San Martin's statement as to the disposition of the weapons was focused on his own actions and bore the requisite "sufficient indicia of reliability" and "particularized guarantees of trustworthiness" to render it admissible against Franqui at their joint trial.
Having determined that the admission of San Martin's initial confession was error because it contained statements which were incriminating as to Franqui, we move to the issue of whether the admission of that confession was harmless error. Though there is language in Cruz which may lend to an argument that error in the admission of interlocking confessions prohibits the error from being harmless, upon close analysis we conclude that both Cruz and Wright authorize a harmless-error review. We point specifically to that portion of Cruz which states:
We hold that, where a nontestifying codefendant's confession incriminating the defendant is not directly admissible against the defendant, the Confrontation *1321 Clause bars its admission at their joint trial, even if the jury is instructed not to consider it against the defendant, and even if the defendant's own confession is admitted against him. Of course, the defendant's confession may be considered ... on appeal in assessing whether any Confrontation Clause violation was harmless.

Cruz, 481 U.S. at 193-94, 107 S.Ct. at 1719-20 (emphasis added) (citation omitted).
Our conclusion is bolstered by recognizing that in an earlier portion of the Cruz opinion Justice Scalia pointed out that the Court was adopting the approach espoused by Justice Blackmun in Parker v. Randolph, 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979). In that case, a plurality of four justices held that where interlocking confessions were introduced, there was no Confrontation Clause violation. Three other justices subscribed to the view expressed by Justice Blackmun that while the introduction of the defendant's own interlocking confession might render the violation of the Confrontation Clause harmless, it could not prevent the introduction of the nontestifying codefendant's confession from constituting a violation. See id. at 81, 99 S.Ct. at 2143-44 (Stevens, J., dissenting). Justice Blackmun alone went on to find that the interlocking nature of the confessions in that case made the error harmless so as to produce a majority for affirmance of the convictions. In fact, Justice Blackmun observed "that in most interlocking-confession cases, any error in admitting the confession of a nontestifying codefendant will be harmless beyond a reasonable doubt." 442 U.S. at 79, 99 S.Ct. at 2142 (Blackmun, J., concurring in part and in the judgment).
The Cruz decision suggested the obvious question of why be concerned about whether an interlocking confession is admissible against the defendant if its admission is always going to be harmless error because it is interlocking. The dissenting opinion in Cruz answered the question by explaining how the Cruz opinion would affect future trials.
That the error the Court finds may be harmless and the conviction saved will not comfort prosecutors and judges. I doubt that the former will seek joint trials in interlocking confession cases, and if that occurs, the judge is not likely to commit error by admitting the codefendant's confession.
481 U.S. at 198, 107 S.Ct. at 1721-22 (White, J., dissenting).
Our analysis with respect to harmless error is reaffirmed in Wright, which states:
[W]e think the presence of corroborating evidence more appropriately indicates that any error in admitting the statement might be harmless rather than that any basis exists for presuming the declarant to be trustworthy.
497 U.S. at 823, 110 S.Ct. at 3151 (footnote omitted). In sum, it is now clear that a nontestifying codefendant's confession which implicates the defendant cannot be introduced simply because it interlocks with the defendant's confession. On the other hand, it is equally clear that the interlocking nature of the confession is likely to render the Confrontation Clause violation harmless on appellate review.
Thus, while that portion of San Martin's confession which implicated Franqui should not have been introduced into evidence, the fact that it mirrors Franqui's confession in so many respects strongly indicates that the error was harmless. Of course, Franqui's confession is powerful evidence of his guilt.[3] Further, Franqui's confession is corroborated by other evidence in the case, including the manner in which the crime was committed. Further, as noted previously, the evidence relating to the police having recovered the guns at San Martin's direction was properly admitted. The State's forensic expert testified that the bullet that killed Lopez was fired from a revolver. One of the guns the police recovered was a revolver, and Franqui confessed that he was the only one of the codefendants armed with that kind of gun. The other two guns recovered by the police and all of the guns carried by the victims were inconsistent with the fatal bullet. Because the revolver was rusty, the expert *1322 could not say with certainty that the fatal bullet came from that revolver. However, he did say that the bullet which killed Lopez came from the same gun as another bullet which was lodged in the passenger mirror of the grey Suburban, and the trajectory of a hole in the passenger window lined up with that bullet, thereby indicating that it was fired from within the vehicle. Franqui was the only occupant of the grey Suburban, and he admitted firing a .357 revolver toward Lopez's vehicle.
The jury specifically found Franqui guilty of first-degree murder either by premeditated design or in the course of a felony,[4] and evidence supporting both theories is extensive. At the very least, we are convinced beyond a reasonable doubt that the Confrontation Clause violation was harmless beyond a reasonable doubt as it relates to Franqui's conviction of first-degree felony murder. State v. DiGuilio, 491 So.2d 1129 (Fla.1986).
As his third issue, Franqui claims two errors were made in the jury selection process. First, he contends that the trial court abused its discretion by prohibiting Franqui's voir dire examination of the jury regarding specific mitigating circumstances.
The scope of voir dire questioning rests in the sound discretion of the court and will not be interfered with unless that discretion is clearly abused. Vining v. State, 637 So.2d 921, 926 (Fla.), cert. denied, 513 U.S. 1022, 115 S.Ct. 589, 130 L.Ed.2d 502 (1994). In Lavado v. State, 492 So.2d 1322 (Fla. 1986), the issue presented was whether the trial court erred in refusing defense counsel's request to ask prospective jurors about their willingness and ability to accept the defense of involuntary intoxication. See also Brown v. State, 614 So.2d 12 (Fla. 1st DCA 1993) (similar issue). We decided that the trial court's restriction of defense counsel's questioning on voir dire denied Lavado his right to a fair and impartial jury. Lavado, 492 So.2d at 1323. We adopted the reasoning of the dissent of Judge Pearson where he stated:
[W]here a juror's attitude about a particular legal doctrine (in the words of the trial court, "the law") is essential to a determination of whether challenges for cause or peremptory challenges are to be made, it is well settled that the scope of the voir dire properly includes questions about and references to that legal doctrine even if stated in the form of hypothetical questions. Pait v. State, 112 So.2d 380 (Fla.1959) (no error where prosecutor propounded question to prospective jurors on voir dire concerning their attitudes toward a finding of guilt on a homicide charge based solely on a theory of felony murder); Pope v. State, 84 Fla. 428, 438, 94 So. 865, 869 (1922) (no error where prosecutor explained legal doctrine of criminal responsibility of aiders and abettors to prospective jurors and then asked them if they would render a verdict of guilty of all necessary elements for conviction under doctrine present).
Lavado v. State, 469 So.2d 917, 919-20 (Fla. 3d DCA 1985). Judge Pearson also noted the importance of "the nature and purpose of the question" in each case, and indicated that asking whether jurors would acquit based on hypothetical testimony rather than asking jurors about their attitudes towards a particular defense would be improper. See id. at 920 n. 3; compare Pope v. State, 84 Fla. 428, 94 So. 865 (1922) with Dicks v. State, 83 Fla. 717, 93 So. 137 (1922).[5]
*1323 In this case, during voir dire, defense counsel asked: "Do you feel that the defendant's young age would be a factor you would take into effect, take into your mind in deciding whether or not to impose the death penalty?"[6]
The State objected and the court sustained the objection directing defense counsel to "[a]sk the question generically." In sustaining the objection the court explained:
I think that you can ask them hypotheticals. If the court were to say to you that the fact that the Defendant has never had a traffic infraction, is a mitigating circumstance, do you follow up an instruction even if you did not feel that it was a mitigating circumstance, or any subject like that? That is what I mean by generic. Not specifically addressing any particular mitigating circumstance.
The State argues that this explanation meant that defense counsel "was welcome to inquire regarding the process so long as the questions were put in the context of the jurors' ability to follow the law, rather than eliciting a promise that the juror would factor in a specific mitigating circumstance." We agree. Our examination of the record reflects that the trial court left defense counsel with plenty of latitude to discuss mitigating circumstances with the jurors in the context of the legal instructions that would be given by the court. We find no abuse of discretion.
As his second jury selection issue, Franqui maintains that the trial court abused its discretion by denying him access to the jury questionnaires after they were returned by the potential jurors. The State responds that this claim is procedurally barred, and even if it were not, it would be meritless. We agree that this claim is procedurally barred but find that in the absence of the bar, the error would nevertheless be harmless since appellant was not prejudiced. The very same, and limited, information in the questionnaires was elicited from the prospective jurors by the trial court in appellant's presence before the trial began.
Finally, Franqui asserts that his convictions for attempted murder must be reversed on the authority of State v. Gray, 654 So.2d 552 (Fla.1995). In Gray, this Court held that the crime of attempted felony murder no longer existed in the State of Florida and directed that our decision would be applied to all cases pending on direct review or not yet final. Consequently, the effect of State v. Gray upon Franqui's convictions for attempted murder must be considered.
On each of the two counts, the jury was instructed on both attempted premeditated murder and attempted felony murder, and the jury returned a verdict of guilt on both charges. Thus, Franqui's convictions for attempted murder must be reversed upon the authority of Valentine v. State, 688 So.2d 313, 317 (Fla.1996), petition for cert. filed, No. 96-9047 (U.S. May 16, 1997), in which this Court held:
Valentine next argues that his conviction for attempted first-degree murder is error. We agree. The jury was instructed on two possible theories on this count, attempted first-degree felony murder and attempted first degree premeditated murder, and the verdict fails to state on which ground the jury relied. After Valentine was sentenced, this Court held that the crime of attempted first-degree felony murder does not exist in Florida See State v. Gray, 654 So.2d 552 (Fla.1995). Because the jury may have relied on this legally unsupportable theory, the conviction for attempted first-degree murder must be reversed. See Griffin v. United States, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991).

Sentencing Phase
Franqui claims that the trial court erred in finding the cold, calculated, and premeditated aggravator. See § 921.141(5)(i), Fla. Stat. (1991). Specifically, *1324 Franqui argues that the State failed to prove beyond a reasonable doubt that the murder, rather than the robbery, was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.
In the instant case, the trial court's sentencing order sets out the basis for its finding:
The evidence established that the defendant was aware of the method in which the Cabanas [sic] went to the bank to make their cash withdrawals. The defendant Franqui himself, in his confession, explained that he was aware of the Cabanas' [sic] schedule up to five to six months before the attempted robbery, murder and attempted murder in this case occurred. The co-defendant Abreu testified that the robbery was carefully planned but that the issue of how to handle the "bodyguard" the Cabanas [sic] had hired was also discussed. The defendant and his co-defendants decided that in order to successfully execute the robbery of the Cabanas [sic] the "bodyguard" would have to be murdered. At some point in time the defendants decided that the defendant Franqui would be the one to distract and assassinate the "bodyguard". It was planned that Franqui would drive his car in such a way as to force the "bodyguard's" car off the road and then he would kill him.
...
The defendant Franqui's passenger window was open and the evidence shows that immediately upon stopping his vehicle Franqui opened fire on Raul Lopez. Consistent with their intentions Franqui killed Raul Lopez before the latter could in any way help his friends.
The State cites codefendant Abreu's testimony as support for the court's finding:
Q. And what did Franqui tell you about the bodyguard, what would he have [to do] with him?
A. He said not to worry about it, that the only one that could shoot there was the bodyguard, not the others.
Q. And what did Franqui tell you or Pablo they were going to do to the bodyguard, if anything?
A. That it would be better for him to be dead first than Franqui.
Q. What did Franqui tell you that they were going to do with the bodyguard during the crime?
A. First he was going to crash against him and throw him down the curb side, and then he would shoot at him, but he didn't do it that way.
The record also reflects that Franqui told Abreu that he, Franqui, would "take care of the escort."
We agree this evidence supports the trial court's finding that not only was the robbery carefully planned in advance, but there was also a plan for Franqui to shoot and kill the bodyguard, the victim here. In sum, we conclude that the trial court did not err in finding the cold, calculated, and premeditated aggravator.[7]
Next, Franqui claims that the cold, calculated, and premeditated jury instruction given in this case is unconstitutionally vague. At the outset, we note that this claim has not been preserved for review. "Claims that the instruction on the cold, calculated, and premeditated aggravator is unconstitutionally vague are procedurally barred unless a specific objection is made at trial and pursued on appeal." Jackson v. State, 648 So.2d 85, 90 (Fla.1994). In the case at bar, defense counsel's objections were directed towards the standard instruction, which was subsequently disapproved of in Jackson, and not to the more detailed instruction which was ultimately given in this case. We find that the instruction approved in Jackson and the instruction given in this case[8] are virtually *1325 identical. Thus, the instruction given in this case was not unconstitutionally vague.
As his next claim, Franqui argues that the trial court erred in failing to find the non-statutory mitigators of marginal or retarded intelligence and brain damage and the statutory mitigators of age and impaired capacity. See § 921.141(6)(f), (g), Fla. Stat. (1991).
A mitigating circumstance must be "reasonably established by the greater weight of the evidence." Nibert v. State, 574 So.2d 1059, 1061 (Fla.1990) (quoting Campbell v. State, 571 So.2d 415, 419 (Fla.1990)).
The trial court's sentencing order rejected low intelligence as a mitigator in the following fashion:
The court has considered the results of Dr. Toomer's test as concerns the defendant's IQ. Since it is impossible for the court to verify the accuracy or validity of such a test, the court must consider it in light of the facts known to the court. In making this analysis the court is conscious of the fact that although an individual's performance on such a test may be unable to exceed his true abilities it may easily reflect less than his best efforts.
The defense suggests that this court should accept, as a non-statutory mitigating factor the fact that, according to Dr. Toomer, Mr. Franqui is mentally retarded. Every piece of evidence presented in this trial, penalty phase and sentencing hearings, with the exception of Dr. Toomer's testimony, definitively establishes that Mr. Franqui is not mentally retarded. The crimes he has committed, as described above, reflect an unshakable pattern of premeditation, calculation and shrewd planning that are totally inconsistent with mental retardation. Mr. Franqui's "good employment background" (one of the asserted non-statutory mitigating circumstances) as established by witness Michael Barecchio shows that he was not only a good employee but that on many occasions he displayed initiative and a capacity to finish his assigned tasks and move on to others without direction or supervision. His ability to establish a meaningful relationship with a woman, to have and raise children with her and to support a family further suggest that he is not mentally retarded.
In order to find that this defendant is mentally retarded the court would have to accept Dr. Toomer's test result and ignore the clear and irrefutable logic of the facts in this case. The court is unwilling to do this and therefore rejects the existence of this non-statutory mitigating circumstance.
In addition, the State's expert witness, Dr. Mutter, expressly rejected Dr. Toomer's findings and opined that Franqui was not mentally retarded. Dr. Mutter also found that Dr. Toomer's reliance on the Beta IQ test result was questionable, since it was inconsistent with both the Wechsler test result and with the mental status examination which he conducted.
With respect to the existence of the organic brain damage mitigator, the trial court stated:
Dr. Toomer testified that there were factors in his evaluation of the defendant that indicated the existence of organicity. However, there is no direct proof of this and the court is not reasonably convinced of the existence of this mitigator. It is therefore rejected.
*1326 Again, Dr. Mutter disputed Dr. Toomer's finding that Franqui may suffer from organic brain damage.
As set out above, we find that there was competent, substantial evidence to support the trial court's conclusion that the non-statutory mitigators of low intelligence and organic brain damage were not established.
As to the statutory mitigators, Franqui argues that the trial court should have found that he failed to appreciate the criminality of his conduct and that his capacity to conform his conduct to the requirements of the law was substantially impaired. See 921.141(6)(f), Fla. Stat. (1993). With regard to the first mitigator, the sentencing order stated:
The court recalls no expert testimony establishing the existence of this mitigating factor nor does the court feel that any evidence presented on the defendant's behalf established it. Accordingly, the court rejects the existence of this statutory mitigating circumstance.
Upon review, the record supports the trial court's conclusion.
Franqui also claims that the court should have found his age, 21, at the time of the crime as a statutory mitigator. See id. § 921.141(6)(g). The trial court considered, but rejected, the defendant's age as a mitigating factor. In Peek v. State, 395 So.2d 492, 498 (Fla.1980), cert. denied, 451 U.S. 964, 101 S.Ct. 2036, 68 L.Ed.2d 342 (1981), we posited that "[t]here is no per se rule which pinpoints a particular age as an automatic factor in mitigation. The propriety of a finding with respect to this circumstance depends upon the evidence adduced at trial and at the sentencing hearing." We find that the trial court did not err in properly considering, but ultimately rejecting, the age mitigator under the circumstances of this case.[9]
As his next issue, Franqui asserts that the trial court erred by prohibiting him from informing the jury about two things: (1) the court's power to impose consecutive sentences for all the counts; and (2) the likelihood of lifelong imprisonment as an alternative to death for the capital offense. In Nixon v. State, 572 So.2d 1336, 1345 (Fla. 1990), cert. denied, 502 U.S. 854, 112 S.Ct. 164, 116 L.Ed.2d 128 (1991), we held that a capital murder defendant, who had also been convicted of three other offenses which carried lengthy maximum penalties, was not entitled to an instruction informing the jury of the maximum sentences for other crimes as a mitigating factor.
We addressed a similar issue in Marquard v. State, 641 So.2d 54 (Fla.1994), cert. denied, 513 U.S. 1132, 115 S.Ct. 946, 130 L.Ed.2d 890 (1995). In that case, the trial court, after the State's objection, cut off defense counsel's penalty phase concluding argument at the point where he began discussing hypothetical sentencing on an armed robbery count. Id. at 57-58. We held no error existed where sentencing on that charge was not before the jury, but rather, the sole issue before them was the proper sentence on the murder charge. Id. at 58; cf. Jones v. State, 569 So.2d 1234, 1239-40 (Fla.1990) (holding that fact that defendant would be removed from society for at least fifty years if he received life sentences for two murders could be argued to and considered by jury as mitigating factor in penalty phase of capital murder prosecution). We conclude, under Nixon and Marquard, that the trial court did not abuse its discretion.[10]
As to the second point, the trial judge instructed the jury that "the punishment for *1327 this crime [first-degree murder] is either death or life imprisonment without the possibility of parole for 25 years." Thus, Franqui's claim is without merit.
As his next issue on appeal, Franqui contends that the death penalty is unconstitutional facially and as applied. The State, however, argues that this claim is procedurally barred since it was never raised in the trial court. We agree. In addition, this claim has been previously rejected. See e.g., Fotopoulos v. State, 608 So.2d 784, 794 n. 7 (Fla.1992), cert. denied, 508 U.S. 924, 113 S.Ct. 2377, 124 L.Ed.2d 282 (1993).
As his last issue on appeal, Franqui argues that the death sentence is a disproportionate penalty in this case compared to others. In reviewing a death sentence, we must consider the circumstances revealed in the record in relation to other decisions and then decide if death is the appropriate penalty, considering that this penalty is reserved for the most aggravated and least mitigated cases. Livingston v. State, 565 So.2d 1288, 1292 (Fla.1988). In the case at bar, the trial court found four aggravators: (1) prior violent felony convictions for aggravated assault, attempted armed robbery, armed robbery, armed kidnapping, and attempted first-degree murder; (2) murder committed during the course of an attempted robbery; (3) murder committed for pecuniary gain (merged with prior aggravator); and (4) murder committed in a cold, calculated, and premeditated manner, without any pretense of moral or legal justification. There were no statutory mitigating circumstances. The non-statutory mitigation consisted of: (1) hardships during the defendant's youth, including abandonment by his mother, the death of a younger brother, and a father's drug and alcohol abuse, and (2) the fact that the defendant was a caring husband, father, brother, and provider.
Franqui first argues that murders committed during armed robberies, such as the one committed by Franqui, are generally not death cases, citing Caruthers v. State, 465 So.2d 496 (Fla.1985). However, Caruthers and other cases cited are clearly factually distinguishable from the circumstances found to exist as aggravation and mitigation in this case.[11]
Next, the Defendant relies on Cannady v. State, 427 So.2d 723 (Fla.1983), and the consolidated cases of McCaskill v. State, and Williams v. State. 344 So.2d 1276 (Fla.1977). However, his reliance on those cases is also misplaced. Those cases involve an override of a jury recommendation of life imprisonment which entails a wholly different legal principle and analysis. Watts v. State, 593 So.2d 198. 204 (Fla.), cert. denied, 505 U.S. 1210, 112 S.Ct. 3006, 120 L.Ed.2d 881 (1992).
Third, Franqui contends that this Court has consistently reversed death sentences in cases where similar mitigating circumstances outweighed even significant aggravating circumstances. Here also, the cases do not support Franqui's position. For example, in Livingston v. State, 565 So.2d 1288 (Fla.1988), the defendant entered a convenience store, fatally shot the female attendant, fired a shot at another woman inside the store, and carried off the cash register. Id. at 1289. The extensive mitigating circumstances included the following: (1) defendant's childhood was marked by severe beatings by his mother's boyfriend; (2) defendant's intellectual functioning was, at best, marginal; (3) defendant was only seventeen; and (4) defendant had used cocaine and marijuana extensively. With respect to aggravators, there were two: (1) previous conviction of a violent felony; and (2) commission of murder during armed robbery. This Court found that the death penalty was not warranted because the mitigating circumstances outweighed the aggravating circumstances.
*1328 In Livingston and other cases like Nibert v. State, 574 So.2d 1059, 1061 (Fla.1990), the mitigating factors were significant in comparison to the limited aggravators. In Franqui's case, however, there is minimal mitigation when considered in conjunction with the substantial aggravation.
Conversely, several recent cases support a conclusion that death is not a disproportionate penalty for Franqui. See, e.g., Lowe v. State, 650 So.2d 969 (Fla.1994), ___ U.S. ___, 116 S.Ct. 230, 133 L.Ed.2d 159 (1995); Smith v. State, 641 So.2d 1319 (Fla.1994), cert. denied, 513 U.S. 1163, 115 S.Ct. 1129, 130 L.Ed.2d 1091 (1995); Mordenti v. State, 630 So.2d 1080 (Fla.), cert. denied, 512 U.S. 1227, 114 S.Ct. 2726, 129 L.Ed.2d 849 (1994). After considering Smith, Lowe, Mordenti, and other relevant cases, we find that we cannot conclude that death is a disproportionate penalty here.
We note that the two attempted murder convictions imposed in this case were among the prior violent felonies enumerated by the trial court in finding the statutory aggravator of prior conviction of a felony involving the use or threat of violence to the person. Because we are reversing the attempted murder convictions, the trial court's reliance upon them in finding the existence of this aggravator was error. However, we are convinced that the error was harmless beyond a reasonable doubt because the trial court also found that Franqui had been previously convicted of the crimes of aggravated assault and attempted armed robbery in one case and armed robbery and armed kidnapping in another.

III. CONCLUSION
Campbell v. State, 571 So.2d 415 (Fla. 1990), and its progeny[12] established our firm adherence to the rule that the trial court must scrupulously follow the statutory and case law guidelines in the sentencing process, and "[w]hen addressing mitigating circumstances, the sentencing court must expressly evaluate in its written order each mitigating circumstance proposed by the defendant to determine whether it is supported by the evidence and whether, in the case of nonstatutory factors, it is truly of a mitigating nature." Id. at 419 (footnote omitted) (citing Rogers v. State, 511 So.2d 526 (Fla.1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988)); see also § 921.141(3), Fla. Stat. (1991). We have also stressed that the trial court must weigh the aggravating circumstances against the mitigating and must expressly consider in its written order each established mitigating circumstance. Campbell, 571 So.2d at 420.
The Campbell procedure was not intended to be a mere formality, but rather to serve as a substantive guide for the most serious of sentencing evaluations and decisions. The procedure mandated was intended to ensure the overall quality and integrity of the complex and delicate sentencing process in death penalty cases. It forces the trial court to consider, with calm and deliberate reflection, the evidence adduced, and to carefully consider and apply the legal standards for determining an appropriate sentence. The process should also promote the uniform application of aggravating and mitigating circumstances in reaching the individualized decision required by law. Id. It also facilitates our appellate review of the trial court's decision. Id.
In this case, we note that the trial court's detailed sentencing order stands as a model of compliance with the Campbell requirement. In a 22-page order,[13] the trial court carefully and deliberately evaluated every mitigating circumstance proposed by the defendant and every aggravating circumstance proposed by the State. In a well-reasoned analysis, the trial court considered counsel's sentencing memorandum, the trial testimony and evidence, and relevant case law to reach its conclusions. In short, it is the epitome of what should be done by a trial court in order to determine an appropriate sentence.
We conclude that the error in admitting San Martin's confession was also harmless *1329 in the penalty phase because San Martin said nothing in his confession that was adverse to Franqui that was not contained in Franqui's confession. San Martin stated that because his vision was obscured he was unable even to say whether Franqui fired his gun, and he did not characterize Franqui as the leader in the enterprise.
Finding no reversible error, we affirm all the judgments and sentences except those of attempted murder. The two convictions of attempted murder are hereby vacated and the pending charges on these crimes are remanded for further proceedings.
It is so ordered.
OVERTON, SHAW, GRIMES, HARDING and WELLS, JJ., concur.
ANSTEAD, J., concurs in part and dissents in part with an opinion, in which KOGAN, C.J., concurs.
ANSTEAD, Justice, concurring in part and dissenting in part.
While I disagree with much of the majority's framework for analyzing Franqui's claim that his right to confront the witnesses against him was violated in this case,[14] I agree with the majority's conclusion that the trial court erred under the Sixth Amendment in admitting against Franqui the testimony of Detective Santos concerning codefendant San Martin's initial confession.[15] I write in dissent to emphasize my disagreement with the majority's holding that a constitutional error of such major proportions was somehow harmless to Franqui in his trial for capital murder.
In Cruz, the United States Supreme Court specifically addressed the application of the harmless error standard in exactly the situation we have before us in this case. First, the Court expressly noted that the defendant's own confession may be considered in determining, on appeal, the harmfulness of the admission of a codefendant's confession implicating the defendant, but also emphasized that the reviewing court must consider for harmless error purposes the similarity of the codefendants' confessions. 481 U.S. at 193-94, 107 S.Ct. at 1719-20.
Further, in Cruz, the defendant attempted to avoid the damaging nature of his alleged confession at trial by showing that his friend had a motive to falsely report to police a confession the defendant allegedly never made. The Court, through Justice Scalia, pointedly explained:

*1330 A codefendant's confession will be relatively harmless if the incriminating story it tells is different from that which the defendant himself is alleged to have told, but enormously damaging if it confirms, in all essential respects, the defendant's alleged confession. It might be otherwise if the defendant were standing by his confession, in which case it could be said that the codefendant's confession does no more than support the defendant's very own case. But in the real world of criminal litigation, the defendant is seeking to avoid his confessionon the ground that it was not accurately reported, or that it was not really true when made.... In such circumstances a codefendant's confession that corroborates the defendant's confession significantly harms the defendant's case, whereas one that is positively incompatible gives credence to the defendant's assertion that his own alleged confession was nonexistent or false.
Id. at 192, 107 S.Ct. at 1718-19. In short, I read the Cruz opinion to mean that where the accused attempts to avoid his own confession at trial on grounds that it was false or never made, the "interlocking" nature of a codefendant's confession bears a positive relationship to its "devastation." Id.
Here, of course, Franqui gave a confession which implicated himself in this crime; and San Martin's confession serves to corroborate Franqui's account. Without San Martin's confession, however, the State's case against Franqui consists only of the fact of the crime itself, Franqui's own statement, and the weapons recovered based upon San Martin's admission as to their location. Neither of the surviving victims could identify Franqui as one of their assailants, and his fingerprints were not found at the scene or on the guns. Like the defendant in Cruz, Franqui attempted to avoid his own confession at trial on grounds that his confession was false, unreliable and should not be believed.[16]
The State, on the other hand, relied on the corroborating, or "interlocking," nature of San Martin's confession to prove its case against Franqui. On numerous occasions throughout her closing argument, the prosecutor argued to the jury that San Martin's confession was a critical piece of evidence of Franqui's guilt, and repeatedly emphasized how it "corroborated" Franqui's own statement. Among these many references, two of the prosecutor's comments are particularly noteworthy as they illustrate that the Cruz test for "devastation," i.e., harmfulness, has been met here. Early in her closing remarks, the prosecutor argued:
We have two people in separate rooms who confess to the homicide detectives[,] to two different homicide detectives, what a coincidence that they both happened to say the exact same thing in those two separate rooms. I mean what do they want you to believe? Mr. Cohen [Franqui's defense counsel] wants you to believe that he's falsely confessing and Mr. DeAguero [San Martin's defense counsel] wants you to believe that he [San Martin] didn't even confess, but we have two people, in two separate rooms telling the same story.
The prosecutor reiterated this point again and again throughout her closing argument to the jury. On another occasion, for instance, she argued:
But see, Technician Kennington wasn't the only witness we called, you have to consider all the evidence that you heard and when you put what he said together with what the crime victims tell you about who had which guns on their side, and together with the confessions of the defendants, that Abreu and Pablo San Martin, both [had] their semi-automatics, there is only one person who could have fired that bullet. Leonardo Franqui.
Yet another comment to the jury, similar to the others, was:

*1331 But you know what, they weren't identified by the victims because they wore masks, they were identified by each other because they both admitted that the other was there and they both admitted that they were there and they both said that they had exactly the same role as the other one says it.
In view of the way the prosecution explicitly relied upon San Martin's confession to prove its case against Franqui, I simply cannot conclude that the State has met its burden of showing that the improper admission of San Martin's confession at this joint trial was harmless to Franqui.
In State v. DiGuilio, 491 So.2d 1129 (Fla. 1986), we explained that:
The harmless error test, as set forth in Chapman and progeny, places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict, or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction.
Id. at 1135. It would be naive to say here that the jury, although it was repeatedly implored to do so by the prosecutor, did not use the codefendant's statement as a major building block in the case against Franqui. We do not have to wonder if this is a "possibility" since we have the prosecutor's explicit pleas to confirm its prejudicial use as a certainty.
In addition, the majority has in essence adopted a per se rule that any error, no matter how serious, will be deemed harmless, if a defendant's confession is allowed into evidence. The majority forgets that it is the role of the jury to evaluate the reliability and weight of the evidence, and not the role of this Court. The majority has found the confession "overwhelming" and, in doing so, has fallen into the trap explicitly warned of by Justice Shaw in DiGuilio:
The [harmless error] test must be conscientiously applied and the reasoning of the court set forth for the guidance of all concerned and for the benefit of further appellate review. The test is not a sufficiency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an overwhelming evidence test. Harmless error is not a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence. The focus is on the effect of the error on the trier-of-fact. The question is whether there is a reasonable possibility that the error affected the verdict. The burden to show the error was harmless must remain on the state. If the appellate court cannot say beyond a reasonable doubt that the error did not affect the verdict, then the error is by definition harmful. This rather truncated summary is not comprehensive but it does serve to warn of the more common errors which must be avoided.
Id. at 1139. This case is analogous to the situation in Cruz where the Supreme Court expressly concluded:
It seems to us illogical, and therefore contrary to common sense and good judgment, to believe that codefendant confessions are less likely to be taken into account by the jury the more they are corroborated by the defendant's own admissions; or that they are less likely to be harmful when they confirm the validity of the defendant's alleged confession.
Cruz, 481 U.S. at 193, 107 S.Ct. at 1719. By emphasizing to the jury that San Martin's confession corroborated Franqui's own account of his involvement and, therefore, that Franqui's confession was reliable and must be believed, Franqui, like Cruz, was significantly harmed in his effort to avoid his own confession at trial. Had testimony concerning San Martin's confession been properly excluded from the trial, the jury might have concluded that Franqui's own confession was not credible and, consequently, his guilt was not proved beyond a reasonable doubt. Instead, the testimony concerning San Martin's confession, which corroborated Franqui's own statement, might well have tipped the balance in the jurors' minds in favor of conviction.
KOGAN, C.J., concurs.
NOTES
[1] At early common law, the exception applied only to statements against pecuniary or proprietary interest; however, the Court noted that there was no reason not to extend the exception to statements against penal interest. Baker at 369.
[2] The tenor of Justice Kennedy's concurring opinion, in which Chief Justice Rehnquist and Justice Thomas joined, suggests that at least five justices agreed with this pronouncement.
[3] While Franqui's attorney questioned the reliability of Franqui's confession at closing argument, there is no competent evidence in the record to support that argument.
[4] The jury found Franqui guilty of first-degree murder "as charged in Count I of the Indictment." Count I of the indictment charged that Franqui "did unlawfully and feloniously kill a human being ... from a premeditated design to effect the death of the person killed or any human being and/or while engaged in the perpetration of ... any robbery."
[5] In earlier cases, we have stated this same rule. In Dicks, we asserted that it is improper to ask jurors hypothetical questions purporting to embody testimony that is intended to be submitted for the purpose of ascertaining from the jurors how they will vote on such a state of the testimony. 93 So. at 138. Counsel may not have jurors indicate, in advance, what their decision will be under a certain state of evidence or upon a certain state of facts. Id. Vining v. State, 637 So.2d at 921, also provides some guidance. In that case, we held that, although the trial judge did not permit questioning about the prospective jurors' personal views of what constitutes a mitigating circumstance, it was not an abuse of discretion since defense counsel was able to explore the potential jurors' understanding of the two-part procedure involved and their ability to follow the law as instructed by the judge in the penalty phase. Id. at 926. Additionally, we found that the questioning was comprehensive enough to permit defense counsel to strike several prospective jurors for cause.
[6] In Franqui's supplemental motion for a new trial, he proffered that, had he been permitted, he would have inquired into each and every mitigating factor relevant to Franqui's case.
[7] See, e.g., Jackson v. State, 648 So.2d 85, 89 (Fla.1994); Crump v. State, 622 So.2d 963, 972 (Fla.1993); Rogers v. State, 511 So.2d 526, 533 (Fla.1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988).
[8] In this case, the trial judge gave the following instruction on the cold, calculated and premeditated aggravator:

The crime for which LEONARDO FRANQUI and/or PABLO SAN MARTIN are to be sentenced was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification.
"Cold" means calm and cool reflection, not prompted by wild emotion.
"Calculated" means a careful plan or prearranged design.
"Premeditated" means that the killing was committed after consciously deciding to do so. The decision must be present in the mind at the time of the killing. The premeditated intent to kill must be formed before the killing. The period of time must be long enough to allow reflection by the defendant.
Although the law does not fix the exact period of time that must pass between the formation of the premeditated intent and the killing, this aggravating factor requires that the premeditation be of a heightened degree, more than what is necessary to prove first degree premeditated murder.
"Pretense of moral or legal justification" means any claim of justification or excuse that, though insufficient to reduce the degree of homicide, nevertheless rebuts the otherwise cold and calculating nature of the homicide.
[9] In fact, the trial court cited to eight cases which support its finding. See, e.g., Scull v. State, 533 So.2d 1137 (Fla.1988), cert. denied, 490 U.S. 1037, 109 S.Ct. 1937, 104 L.Ed.2d 408 (1989); Kokal v. State, 492 So.2d 1317 (Fla. 1986); Cooper v. State, 492 So.2d 1059 (Fla. 1986), cert. denied, 479 U.S. 1101, 107 S.Ct. 1330, 94 L.Ed.2d 181 (1987).
[10] Appellant relies on Simmons v. South Carolina, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), in which the United States Supreme Court held that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." Id. at 156, 114 S.Ct. at 2190. However, Simmons is inapposite here since this case does not involve any direct effort to impose the death penalty based on the defendant's future dangerousness.
[11] In Caruthers, the defendant fatally shot a store clerk while attempting to rob a convenience store. We found a death sentence not appropriate where there was only one valid aggravator (commission of murder during armed robbery), one statutory mitigator (no significant history of prior criminal activity), and several non-statutory mitigators (voluntary confession, conditional guilty plea subject to a life sentence, mutual love and affection of family and friends, remorse, encouragement of younger brother to do well and avoid violating the law). Id. at 499; see also Rembert v. State, 445 So.2d 337 (Fla.1984).
[12] See, e.g., Ferrell v. State, 653 So.2d 367 (Fla. 1995); Crump v. State, 622 So.2d 963 (Fla.1993).
[13] We note, however, that there is no "magic" number of pages for a compliant sentencing order.
[14] In my view, Franqui's claim of error can be properly analyzed only by first determining whether, under Florida evidence law, the confession of the nontestifying codefendant San Martin was admissible at trial under a hearsay exception. In fact, it is this Court's previous failure to deal with this issue that underlies our prior misinterpretation of Cruz and Lee that we are receding from today. Because of our prior misinterpretations, trial courts too have overlooked the necessity to apply a state evidentiary standard for the admission of out-of-court statements before even getting to the federal constitutional issue. Only if San Martin's confession was admissible under the state Evidence Code, would we then jump to the majority's focus on whether the trial court's failure to grant the severance violated Franqui's Sixth Amendment constitutional right to confront witnesses against him.

Under the Florida Evidence Code, I conclude that the testimony of Detective Michael Santos relating to the jury the oral confession of Franqui's codefendant, Pablo San Martin, was inadmissible as a statement against penal interest, the only possible hearsay exception applicable here. On this point, I find the U.S. Supreme Court's interpretation of the virtually identical provision in the Federal Evidence Code to be compelling. The United States Supreme Court's construction of the statement against penal interest exception to the hearsay rule set out in Williamson v. United States, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994), limited this exception to statements that "are individually self-inculpatory." While some of Detective Santos' testimony at trial concerned solely self-inculpatory statements made by San Martin during his oral confession, the majority of San Martin's statements related by Detective Santos also implicated the accused, Leonardo Franqui. Moreover, some of San Martin's statements, as told by Detective Santos, also served to exonerate San Martin. There was no attempt here to limit San Martin's statement or eliminate any portions particularly inculpatory as to Franqui or exculpatory as to San Martin. Thus, I find that the detective's testimony concerning San Martin's oral confession does not make it over even the first hurdle of admissibilitythe Florida Evidence Codelet alone the Sixth Amendment Confrontation Clause.
[15] I concur fully in the majority opinion's acknowledgment that the trial court's sentencing order stands as a model for compliance with our directives in Campbell and other cases.
[16] In closing argument, Franqui's defense counsel argued to the jury:

Now, the State will argue I'm sure that Mr. Franqui admits that there was a plan to rob in his statement but it's going to be for you to consider the reliability of that statement.
Because that statement when considered in light of all the evidence in this case is not reliable and cannot be believed.
In fact, Franqui's own confession was the subject of a pretrial motion to suppress alleging numerous grounds for its suppression and unreliability.