630 So.2d 1080 (1994)
Michael MORDENTI, Appellant,
v.
STATE of Florida, Appellee.
No. 78753.
Supreme Court of Florida.
January 27, 1994.
*1081 Joryn Jenkins, Tampa, for appellant.
Robert A. Butterworth, Atty. Gen., and Robert J. Landry, Asst. Atty. Gen., Tampa, for appellee.
*1082 PER CURIAM.
The appellant, Michael Mordenti (Mordenti), appeals his convictions of conspiracy to commit murder and first-degree murder and his corresponding sentences of thirty years' imprisonment and death. We have jurisdiction,[1] and affirm Mordenti's convictions and sentences, including his sentence of death for the contract murder at issue in this case.
This case involves the murder of Thelma Royston. The victim's husband, Larry Royston (Royston), allegedly hired Mordenti to commit the murder. Royston and Mordenti were charged with the victim's murder after Royston's cellular phone records led detectives to Mordenti's former wife, Gail Mordenti, who subsequently confessed that she had acted as the contact person between Mordenti and Royston. After Royston and Mordenti were charged, Royston committed suicide. Consequently, his version of the events at issue was not available. At trial, Mordenti's defense was that he was some place else when the murder occurred.
Testimony at trial revealed the following details regarding the murder. The victim, Thelma Royston, lived with her mother and her husband. On the night of the murder, Royston told the victim that the lights were off in the barn. Because the Roystons' horse business required the barn lights to be left on until 10:00 or 11:00 each night, the victim and her mother went outside to turn on the lights. When they went outside, they noticed an unidentified man off in the distance. The victim went to talk to him and called back to her mother that the man was there to discuss a horse Royston had for sale. The victim's mother went back inside to tell Royston that the man was there, but when her dog began barking she went back out to investigate. Upon doing so, she discovered the victim's body in the barn. The victim had suffered multiple gunshot and stab wounds. Because it was night and the man had been so far off in the distance, the victim's mother was unable to furnish a description of him to the police.
Because the victim suffered multiple gunshot and stab wounds, the medical examiner was unable to determine from which wounds the victim had died or whether she had died instantaneously. However, there were no defensive wounds and no indication that anything had been taken or that the victim had been sexually assaulted.
Additional testimony revealed that the victim and Royston had been contemplating divorce, but that Royston thought the victim was asking for too much money. A former girlfriend of Royston's testified that Royston had asked her to kill his wife by either shooting or stabbing her to make it look like a burglary, but the former girlfriend had refused. Mordenti's former wife, Gail Mordenti, testified that Royston asked her if she knew of anyone who would "get rid of his wife" for $10,000. Gail Mordenti stated that she subsequently asked Mordenti if he knew of anyone who would kill Royston's wife and he responded: "Oh, hell, for that kind of money, I'll probably do it myself." Gail Mordenti explained that she acted as the middle person between Royston and Mordenti by conveying information about the best time and place for the murder and by supplying a photograph of the victim and a map of the ranch.
Gail Mordenti further testified that, when she first approached Mordenti about murdering the victim, he informed her that it would be impossible to commit the murder as Royston wanted and that he would not do it. However, Royston continued to insist to Gail Mordenti that he wanted the murder committed. Gail Mordenti finally placed Royston directly in touch with Mordenti. Royston's cellular phone records reflected that he made a thirteen-minute telephone call to Mordenti's number on the day of the murder. After the murder, Gail Mordenti delivered payments totaling $17,000 from Royston to Mordenti. According to her, the amount had risen from $10,000 to $17,000 because Mordenti had to get rid of a car. Mordenti gave Gail Mordenti between $5,000 and $6,000 of the $17,000 over time to help her pay her bills. Additionally, Gail Mordenti testified that Mordenti described the murder to her, stating that the victim "put up quite a fight" and that he "shot her in the head with a .22." *1083 He also told Gail Mordenti that the victim had a lot of jewelry on and that he felt really bad that he couldn't take it. She also testified that Mordenti had a number of guns that he kept as "throw away" pieces and that she knew he was associated with some "shady" people. (A cellmate of Mordenti's also testified that Mordenti told him he was "in the mob.") For her testimony, Gail Mordenti was offered complete immunity.
No physical evidence was produced linking Mordenti to the crime, and Gail Mordenti was the only witness who was able to place him at the scene of the murder. However, her testimony was consistent with what police knew about the murder and some of her testimony matched information about the murder that had not been made public.
In his defense, Mordenti produced three witnesses who stated that he had attended an automobile auction on the night of the murder. Mordenti was a used car dealer and frequently attended auctions where he purchased cars for resale. The prosecution, however, was able to point to a number of inconsistencies in the witnesses' testimony. Additionally, one of the three witnesses was one of Mordenti's girlfriends, and the other two witnesses had testified only after being contacted by the girlfriend over a year after the murder and after being reminded by the girlfriend that the night of the murder was the same night Mordenti had attended the auction.
On these facts, the jury found the defendant guilty of first-degree murder and conspiracy to commit murder.
At the penalty phase, the State relied on the testimony previously presented during the guilt phase and offered no evidence. Mordenti, however, presented fifteen witnesses who testified that Mordenti was of value to society, that he served honorably in the military, that he suffered from a deprived childhood, that he was a good friend, a good employer, a good employee, and a good parent to his girlfriend's children, and that he was fair, hardworking and of good character. The court gave three mitigating instructions to be considered by the jury if supported by the evidence: (1) that Mordenti was an accomplice in the offense for which he was to be sentenced but the offense was committed by another person and his participation was relatively minor; (2) that Mordenti was fifty years old; and (3) that Mordenti was of good character.
The jury was instructed on three aggravating factors: (1) that the murder was committed for financial gain; (2) that the murder was particularly heinous, atrocious, or cruel; and (3) that the murder was cold, calculated, and premeditated.
The jury voted 11-1 for the death penalty. In sentencing Mordenti to death, the trial judge found that the murder had been committed for financial gain and was cold, calculated, and premeditated, but not that it was heinous, atrocious, and cruel. She also found the following factors in mitigation: (1) that Appellant was fifty at the time of the crime; (2) that Appellant had no significant history of prior criminal activity;[2] (3) that Appellant's father died while Appellant was young and that he was abandoned by his mother; (4) that Appellant was a good stepson to his stepparents; (5) that Appellant supported the woman who lived with him and her two children; (6) that Appellant was a thoughtful friend and employer and was fair in business dealings; (7) that Appellant received an honorable discharge from the Coast Guard; and (8) that Appellant behaved appropriately in court during the trial.
Mordenti now appeals his convictions of first-degree murder and conspiracy to commit murder and his sentences of death for the murder conviction and of thirty years' confinement for the conspiracy conviction. In support of this appeal, he contends that the trial judge erred by: (1) allowing a husband/wife team of prosecutors to try his case; (2) failing to replace a juror; (3) allowing testimony of the victim's mother as to identity and admitting photographs of the victim; (4) allowing evidence to be admitted on three different occasions regarding Mordenti's previous *1084 involvement with crime; (5) instructing the jury on the aggravating factor of heinous, atrocious, or cruel; (6) permitting the prosecutor's reference to Mordenti as a "con man" and a "con artist" in the penalty phase closing argument; (7) permitting the State to threaten to rebut the mitigating factor of no significant prior criminal history, thereby prompting the defense to waive a jury instruction on this mitigating factor; (8) giving both the cold, calculated, and premeditated and committed for financial gain aggravating circumstance instructions because the giving of those instructions constituted impermissible doubling; and (9) sentencing Mordenti to death because such a sentence is disproportionate to the circumstances of the offense in this case.
The majority of the issues raised by Mordenti were not objected to at trial and, absent fundamental error, are procedurally barred. Davis v. State, 461 So.2d 67 (Fla. 1984), cert. denied, 473 U.S. 913, 105 S.Ct. 3540, 87 L.Ed.2d 663 (1985); Ashford v. State, 274 So.2d 517 (Fla. 1973). "[F]or an error to be so fundamental that it can be raised for the first time on appeal, the error must be basic to the judicial decision under review and equivalent to a denial of due process." State v. Johnson, 616 So.2d 1, 3 (Fla. 1993). Under this standard, we find that only five of the nine issues merit further discussion  three involving the guilt phase and two involving the penalty phase. We summarily reject the remaining claims, finding that they are procedurally barred and otherwise without merit.

Guilt Phase
First, we address Mordenti's claim that the husband/wife team's prosecution of this case created an unfair advantage in favor of the State and constituted fundamental error so as to allow this issue to be raised for the first time on appeal. The record reflects that, during the course of the trial, five references were made to the fact the prosecutors were married. Of those five references, one was made during introductions to explain the similarity of the prosecutors' names, one was made by a defense witness, and the remaining three were made in the context of cross-examining that defense witness to clarify who was present during pretrial questioning of that witness. Under the circumstances, we find that no error was created by the fact that the prosecutors were married to each other, much less error that was fundamental.
Next, Mordenti argues that the trial judge erred in allowing the State to introduce into evidence a series of morgue photographs of the victim and in allowing testimony of the victim's mother as to identity. Mordenti argues that the probative value of the photographs was outweighed by their prejudicial impact and that the photographs were irrelevant given that the manner of death was not in dispute. We disagree. The morgue photographs were introduced in conjunction with the medical examiner's testimony to show the location of the lethal wounds and how those lethal wounds were inflicted. Additionally, the trial judge specifically limited the number of photographs to be introduced by directing that any repetitious photographs be excluded. As to the identity issue, Mordenti's counsel failed to object to the identification at trial, and the claim is now procedurally barred. For these reasons, we reject this claim.
Mordenti also asserts that, despite defense counsel's objection, the trial judge allowed Gail Mordenti to testify that Mordenti had guns not registered to him that were "throw away pieces" and that she knew he "was dealing with some people that were shady." Additionally, Mordenti argues that a cellmate of Mordenti's should not have been allowed to testify that Mordenti let him know that Mordenti was "in the mob." Given that the murder weapon was never found, we find that the comments of Gail Mordenti were properly admitted to show that Mordenti had access to the type of gun used in the murder at issue. On the other hand, we do find that it was error for Mordenti's cellmate to testify regarding Mordenti's purported "mob" association; however, because defense counsel failed to request a mistrial, this claim is procedurally barred. Marshall v. State, 604 So.2d 799 (Fla. 1992), cert. denied, ___ U.S. ___, 113 S.Ct. 2355, 124 L.Ed.2d 263 (1993); Clark v. State, 363 So.2d 331 (Fla. 1978), abrogated on other grounds, *1085 State v. DiGuilio, 491 So.2d 1129 (Fla. 1986). Further, this testimony was not emphasized and, even if the error were not barred, we find that the elimination of the cellmate's testimony would not have changed the outcome of this proceeding and otherwise constituted harmless error. State v. DiGuilio, 491 So.2d 1129 (Fla. 1986).

Penalty Phase
Regarding the penalty phase proceeding, Mordenti asserts that the trial judge erroneously instructed the jury on the aggravating factor of heinous, atrocious, and cruel in violation of the United States Supreme Court's ruling in Espinosa v. Florida, ___ U.S. ___, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992). We find that the instruction given in this case fully defined heinous, atrocious, and cruel, and was not the invalid instruction at issue in Espinosa. Moreover, given that conflicting evidence existed as to whether the victim died instantaneously, we find that the trial judge did not err in giving this valid instruction to the jury, even though the trial judge did not rely on this aggravating factor when imposing Mordenti's death sentence.
Finally, Mordenti argues that the death penalty is disproportionate in this case given the heavy mitigation, the limited number of aggravating factors presented, and the fact that Gail Mordenti received complete immunity for her testimony. We do not agree. As found by the trial judge, the mitigating factors in this case do not outweigh the aggravating circumstances. Additionally, although Gail Mordenti was involved in this case by acting as the contact person between Royston and Mordenti, it was Mordenti who actually carried out the contract murder. Compare Downs v. State, 572 So.2d 895 (Fla. 1990) (shooter in cold-blooded contract murder appropriately received death penalty even though less culpable codefendant received life), cert. denied, ___ U.S. ___, 112 S.Ct. 101, 116 L.Ed.2d 72 (1991), with the instant case.
Having found no reversible error, and having considered any possible cumulative effect of the errors alleged, we affirm Michael Mordenti's convictions of conspiracy to commit murder and first-degree murder and his corresponding sentences of thirty years' imprisonment and death.
It is so ordered.
BARKETT, C.J., and OVERTON, McDONALD, SHAW, GRIMES, KOGAN and HARDING, JJ., concur.
NOTES
[1] Art. V, § 3(b)(1), Fla. Const.
[2] The trial judge found this factor in mitigation even though the defense waived a jury instruction on this issue.