894 So.2d 161 (2004)
Michael MORDENTI, Appellant,
v.
STATE of Florida, Appellee.
Michael Mordenti, Petitioner,
v.
James V. Crosby, Jr., Respondent.
Nos. SC02-1159 & SC02-2643.
Supreme Court of Florida.
December 16, 2004.
Rehearing Denied February 4, 2005.
*164 Martin J. McClain of McClain and McDermott, Wilton Manors, FL and Heidi Brewer, Tallahassee, FL, for Appellant/Petitioner.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL and Robert J. Landry, Assistant Attorney General, Tampa, FL, for Appellee/Respondent.
PER CURIAM.
Michael Mordenti appeals the denial of his motion for postconviction relief filed pursuant to Florida Rule of Criminal Procedure 3.850. Mordenti also petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons explained below, we reverse the trial court's order denying Mordenti's postconviction motion and remand to the trial court for a new trial.

FACTS AND PROCEDURAL HISTORY
Mordenti was convicted of conspiracy to commit murder and the first-degree murder of Thelma Royston. The jury, by a vote of eleven to one, recommended the *165 death penalty. Following that recommendation, the trial court sentenced Mordenti to thirty years in prison on the conspiracy to commit murder charge and imposed a sentence of death for the first-degree murder charge. The facts pertaining to the murder of Thelma Royston were fully detailed in our direct appeal opinion:
This case involves the murder of Thelma Royston. The victim's husband, Larry Royston (Royston), allegedly hired Mordenti to commit the murder. Royston and Mordenti were charged with the victim's murder after Royston's cellular phone records led detectives to Mordenti's former wife, Gail Mordenti, who subsequently confessed that she had acted as the contact person between Mordenti and Royston. After Royston and Mordenti were charged, Royston committed suicide. Consequently, his version of the events at issue was not available. At trial, Mordenti's defense was that he was some place else when the murder occurred.
Testimony at trial revealed the following details regarding the murder. The victim, Thelma Royston, lived with her mother and her husband. On the night of the murder, Royston told the victim that the lights were off in the barn. Because the Roystons' horse business required the barn lights to be left on until 10:00 or 11:00 each night, the victim and her mother went outside to turn on the lights. When they went outside, they noticed an unidentified man off in the distance. The victim went to talk to him and called back to her mother that the man was there to discuss a horse Royston had for sale. The victim's mother went back inside to tell Royston that the man was there, but when her dog began barking she went back out to investigate. Upon doing so, she discovered the victim's body in the barn. The victim had suffered multiple gunshot and stab wounds. Because it was night and the man had been so far off in the distance, the victim's mother was unable to furnish a description of him to the police.
Because the victim suffered multiple gunshot and stab wounds, the medical examiner was unable to determine from which wounds the victim had died or whether she had died instantaneously. However, there were no defensive wounds and no indication that anything had been taken or that the victim had been sexually assaulted.
Additional testimony revealed that the victim and Royston had been contemplating divorce, but that Royston thought the victim was asking for too much money. A former girlfriend of Royston's testified that Royston had asked her to kill his wife by either shooting or stabbing her to make it look like a burglary, but the former girlfriend had refused. Mordenti's former wife, Gail Mordenti, testified that Royston asked her if she knew of anyone who would "get rid of his wife" for $10,000. Gail Mordenti stated that she subsequently asked Mordenti if he knew of anyone who would kill Royston's wife and he responded: "Oh, hell, for that kind of money, I'll probably do it myself." Gail Mordenti explained that she acted as the middle person between Royston and Mordenti by conveying information about the best time and place for the murder and by supplying a photograph of the victim and a map of the ranch.
Gail Mordenti further testified that, when she first approached Mordenti about murdering the victim, he informed her that it would be impossible to commit the murder as Royston wanted and that he would not do it. However, Royston continued to insist to Gail Mordenti *166 that he wanted the murder committed. Gail Mordenti finally placed Royston directly in touch with Mordenti. Royston's cellular phone records reflected that he made a thirteen-minute telephone call to Mordenti's number on the day of the murder. After the murder, Gail Mordenti delivered payments totaling $17,000 from Royston to Mordenti. According to her, the amount had risen from $10,000 to $17,000 because Mordenti had to get rid of a car. Mordenti gave Gail Mordenti between $5,000 and $6,000 of the $17,000 over time to help her pay her bills. Additionally, Gail Mordenti testified that Mordenti described the murder to her, stating that the victim "put up quite a fight" and that he "shot her in the head with a .22." He also told Gail Mordenti that the victim had a lot of jewelry on and that he felt really bad that he couldn't take it. She also testified that Mordenti had a number of guns that he kept as "throw away" pieces and that she knew he was associated with some "shady" people. (A cellmate of Mordenti's also testified that Mordenti told him he was "in the mob.")[1] For her testimony, Gail Mordenti was offered complete immunity.
No physical evidence was produced linking Mordenti to the crime, and Gail Mordenti was the only witness who was able to place him at the scene of the murder. However, her testimony was consistent with what police knew about the murder and some of her testimony matched information about the murder that had not been made public.
In his defense, Mordenti produced three witnesses who stated that he had attended an automobile auction on the night of the murder. Mordenti was a used car dealer and frequently attended auctions where he purchased cars for resale. The prosecution, however, was able to point to a number of inconsistencies in the witnesses' testimony. Additionally, one of the three witnesses was one of Mordenti's girlfriends, and the other two witnesses had testified only after being contacted by the girlfriend over a year after the murder and after being reminded by the girlfriend that the night of the murder was the same night Mordenti had attended the auction.
On these facts, the jury found the defendant guilty of first-degree murder and conspiracy to commit murder.
Mordenti v. State, 630 So.2d 1080, 1082-83 (Fla.1994).
In sentencing Mordenti to death, the trial judge found two aggravating circumstances  that the murder had been committed for financial gain and was cold, calculated, and premeditated. See id. at 1083. In mitigation, the trial judge found the following factors: (1) Mordenti was fifty at the time of the crime; (2) Mordenti had no significant history of prior criminal activity; (3) Mordenti's father died while Mordenti was young and he was abandoned by his mother; (4) Mordenti was a good stepson to his stepparents; (5) Mordenti supported the woman who lived with him and her two children; (6) Mordenti was a thoughtful friend and employer and was fair in business dealings; (7) Mordenti received an honorable discharge from the Coast Guard; and (8) Mordenti behaved appropriately in court during the trial. See id.
On direct appeal, this Court affirmed Mordenti's convictions and sentences. See *167 id. at 1082. On September 2, 1995, Mordenti filed a motion for postconviction relief in the trial court. See Mordenti v. State, 711 So.2d 30, 31 (Fla.1998). On September 30, 1996, the trial court issued an order summarily denying Mordenti's postconviction motion without holding an evidentiary hearing and without providing Mordenti's counsel an opportunity to be heard. See id. at 31. This Court reversed the summary denial of Mordenti's postconviction motion and directed the trial court to hold a Huff[2] hearing. See id. at 33. On October 19, 2000, the trial court held a Huff hearing, where it granted an evidentiary hearing on four claims and denied the remaining claims.
After the evidentiary hearing, the trial court denied relief on the four remaining claims. Mordenti now appeals the trial court's denial of postconviction relief, presenting the following claims for review: (1) whether the lower court erred in denying his claims that the State committed Giglio[3] violations; (2) whether the lower court erred in denying his claims that the State committed Brady[4] violations; (3) whether guilt phase counsel was ineffective;[5] (4) whether the trial court erred in permitting the testimony of Senior Legal Assistant *168 with the Attorney General's Office, Paula Montlary, who was a former employee of trial defense counsel Richard Watts; (5) whether counsel at the penalty and sentencing phase was ineffective;[6] and (6) whether the trial court erred in summarily denying five claims presented in his postconviction motion.[7] We conclude that the resolution of claim (2) is dispositive. Moreover, our conclusion to remand this case for a new trial is supported by our cumulative analysis, which addresses several of Mordenti's purported Brady and Giglio violations. Accordingly, claims (3), (4), (5), and (6), as well as Mordenti's habeas claims, are rendered moot in light of this opinion. See Clark v. State, 690 So.2d 1280, 1282 n. 4 (Fla.1997).

DISCUSSION
Mordenti was convicted primarily on the testimony of one woman, Gail Mordenti Milligan. No physical evidence was produced linking Mordenti to the murder, and Gail was the only witness who was able to place Mordenti at the scene of the murder. There was no money trail, no eyewitnesses, no confession, no murder weapon, no blood, no footprints, and no DNA evidence linking Mordenti to the murder. The prosecution's entire case relied solely on Gail's testimony, and the jury crediting that testimony. Therefore, any undisclosed impeachment evidence or undisclosed evidence of a nature that could lead to relevant information pertaining to Gail's testimony was of critical importance in this case.
Of the numerous Brady claims presented in this appeal, we conclude that two are dispositive  (1) the State's withholding of Gail's date book and (2) the State's withholding of information provided by John Trevena, Larry Royston's attorney. Accordingly, we address each of these Brady violations in turn.
Brady requires the State to disclose material information within the State's possession or control that tends to negate the guilt of the defendant. See Guzman v. State, 868 So.2d 498, 508 (Fla.2003). Errors involving the suppression of evidence in violation of Brady present issues of constitutional magnitude. See Cardona v. State, 826 So.2d 968, 973 (Fla.2002). As expressed in Brady, the rule is premised on the principle that reversal is warranted when the State fails to disclose to the defense exculpatory or impeaching evidence that prejudices the defendant, thereby undermining confidence that he received a fair trial:
The principle . . . is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused. Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. . . . A prosecution that withholds evidence . . . which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding *169 that does not comport with standards of justice. . . .
Cardona, 826 So.2d at 972-73 (quoting Brady, 373 U.S. at 87-88, 83 S.Ct. 1194).
To establish a Brady violation, a defendant must demonstrate: "(1) the State possessed evidence favorable to the accused because it was either exculpatory or impeaching; (2) the State willfully or inadvertently suppressed the evidence; and (3) the defendant was prejudiced." Allen v. State, 854 So.2d 1255, 1259 (Fla.2003) (citing Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)); see also Banks v. Dretke, 540 U.S. 668, 124 S.Ct. 1256, 1272, 157 L.Ed.2d 1166 (2004). The determination of whether a Brady violation has occurred is subject to independent appellate review. See Cardona, 826 So.2d at 973. We review each of the Brady elements with regard to Gail's date book and the information provided by Trevena to the State, respectively.
The trial court below explained:
[Mordenti] alleges that the State withheld Gail Mordenti's date book. In the date book, it describes a lunch date with Larry Royston, which, according to the date book, occurred on April 11, 1989. (See Transcript from November 27, 2001, p. 144, attached). Defense counsel was quick to point out, however, that Gail Mordenti testified at trial that it was probably in February or March when she invited Larry Royston over for lunch. (See Transcript from November 27, 2001, p. 143, attached).
[Mordenti] also points out the entry in Gail Mordenti's date book from June 7, 1989, the date of Thelma Royston's murder. The entry is as follows:
Call on ticket for Michael
* * *
Make calls again to Bus Co.
When asked of these entries, Gail Mordenti has a faint recollection. When specifically asked about the reference to "Michael," she indicated that it was in reference to her husband, Michael Milligan. (See Transcript from November 27, 2001, p. 194, attached). She has no recollection about the bus company reference. (See id.). [Mordenti] argues that this would have been very important for investigatory purposes as Mr. [John] Atti[8] speculated that Gail Mordenti might have substituted Michael Mordenti's name for the name of the real killer, Michael Milligan. (See Transcript from November 6, 2001, p. 331, attached).
Here, the Court does not find as [sic] Brady violation, as prejudice must ensue. [Mordenti] has not alleged any prejudice, only speculation that this entry from Gail Mordenti's date-book would have helped for the sake of investigatory purposes.
Even though the failure to provide the defense with a copy of Gail Mordenti's date book may have constituted a discovery violation, the Court finds no prejudice in Defendant not receiving copies of it. The Court finds that Gail Mordenti testified that she had one lunch date with Larry Royston, and the fact that she was slightly inaccurate as to when the lunch occurred is inconsequential. Even if the State withheld the date book, the Court finds that the outcome was not prejudiced. Prejudice must ensue to support a finding of a Brady violation. See Rogers v. State, 782 So.2d 373, 378 (Fla.2001). As such, the allegation that the State withheld Gail Mordenti's date book is denied.
*170 We first examine whether Gail's date book was favorable to Mordenti because it was either exculpatory or impeaching. See Allen, 854 So.2d at 1259. Here, Mordenti asserts that the entries in Gail's date book were favorable to him because the entries were impeaching. There is absolutely no question that the withheld date book would have assisted Mordenti in the impeachment of Gail, the State's critical witness. The date book revealed information not otherwise disclosed to the defense that indicated several inconsistencies in Gail's trial testimony. Specifically, entries in Gail's date book conflicted with her testimony regarding when she had lunch with Larry Royston. It was at this lunch that the murder plan was allegedly born. The conflicting dates, in turn, directly affected the credibility of other portions of Gail's testimony, including representations she made about first soliciting a man named Jack Gartley to commit the murder. Finally, entries in the date book on the date of the murder implicated Michael Milligan, Gail's boyfriend at the time of the murder and later her husband, in the murder of Thelma Royston. Information from the date book that conflicted with Gail's testimony with regard to these important components of the conspiracy, most assuredly, could have impeached Gail, whose credibility comprised the State's entire case against Mordenti. Therefore, the first Brady prong is satisfied.
We next consider whether the State willfully or inadvertently suppressed the evidence. To comply with Brady, the individual prosecutor has a duty to learn of any favorable evidence and to disclose that evidence to the defense. See Allen, 854 So.2d at 1259. The State does not contest that Gail's date book was in the prosecutor's possession at the time of trial but was not disclosed to Mordenti's trial counsel. Therefore, the second Brady prong, that the date book was suppressed by the State, either willfully or inadvertently, is also satisfied.
Finally, we determine whether the State's failure to disclose this evidence prejudiced Mordenti. To satisfy this prong of Brady, a defendant must establish that the suppressed evidence was material. See Allen, 854 So.2d at 1260. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Strickler, 527 U.S. at 280, 119 S.Ct. 1936 (quoting United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). The United States Supreme Court has defined "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); see also Bagley, 473 U.S. at 682, 105 S.Ct. 3375 (expressly applying the Strickland formulation of "reasonable probability" to Brady cases).
Whether evidence is "material" for Brady purposes is a mixed question of law and fact subject to independent review. See Allen, 854 So.2d at 1260. Gail's date book is "material" if "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence in the verdict." Id. (quoting State v. Huggins, 788 So.2d 238, 243 (Fla.2001)).
In determining whether prejudice has ensued, this Court must analyze the impeachment value of the undisclosed evidence. See State v. Lewis, 838 So.2d 1102, 1116 (Fla.2002) (concluding the defendant could not demonstrate he suffered any prejudice where "the impeachment value of th[e] [undisclosed] evidence would have been limited"); see also Cardona, 826 *171 So.2d at 974 (concluding that "the reports of the undisclosed interviews contain material inconsistencies on several key points not addressed at trial that could have seriously undermined [the witness's] credibility"). We certainly recognize that the significance of impeaching Gail in the instant case was critical. Gail was a pivotal and weighty witness for the State. Gail was not only the most decisive witness at trial, but the only witness who was able to place Mordenti at the scene of the murder. Gail's testimony and credibility were of significant consequence when we consider that no physical evidence was produced linking Mordenti to the crime. Ultimately, the entire case against Mordenti rose and fell on Gail's testimony.
Gail's truthfulness was the anchor of the prosecutor's effort to convince the jury that Gail's story was credible and worthy of belief. The importance of Gail to the State's case was made clear during the prosecutor's closing argument:
The actions of Gail Mordenti show you that she's telling the truth, and the actions of Michael Mordenti in his repeated denials of ever knowing or even hearing of Larry Royston, show you beyond any reasonable doubt that she's telling you the truth.
At the evidentiary hearing, the prosecutor admitted that Gail's credibility "was a very important issue." The key to a determination of prejudice is whether the withheld evidence undermines our confidence in the result. See Cardona, 826 So.2d at 981. The undisclosed evidence would not only have empowered the defense to discredit Gail but also would have stifled the prosecution's fervid efforts to portray Gail as a believable witness. Specifically, the withheld information would have cast doubt on the veracity of Gail's testimony and the timing of critical events leading up to the murder.
On this record, our confidence in the outcome of Mordenti's trial is undermined. Mordenti's trial counsel, Atti, testified at the evidentiary hearing that he attempted to develop a time line of Gail's claimed sequence of events. Clearly, the entries in the undisclosed date book contradicted Gail's trial testimony in several ways that the defense could have used as potent impeachment of Gail at trial and would have assisted counsel in developing a defense related to critical events.
First, the date book disclosed impeachment evidence with regard to the specific date of Gail's lunch with Larry Royston. During this jury trial, Gail was never impeached with regard to whether she had lunch with Royston in February or March of 1989, as she had testified, or whether the lunch occurred on April 11, as revealed in the date book.[9] When the timeline of events from Gail's testimony is juxtaposed with the timeline of events substantiated by the date book, the significance of representing to the jury that the lunch date occurred in February or March instead of on April 11 is revealed. At trial, when Gail testified that the lunch occurred in February or March she revealed to the jury that the date of the lunch was the first time she and Royston discussed the murder. Gail testified that she had undertaken no actions in furtherance of the murder until after the lunch date. Therefore, if the lunch date occurred on April 11, Gail at trial would have had to explain to the jury how all the events involving the murder, including recruiting Jack Gartley to be the killer, occurred between April 11 *172 and June 7, instead of between February or March and June 7.
At trial, Gail testified that Jack Gartley was the first person she recruited to commit the murder after her February or March lunch date with Royston. The jury had no evidence to contradict the notion that in February or March Gail would have turned to Gartley, a man she worked with, for help. However, on April 12, Gail was questioned with regard to a grand theft investigation of Gartley, and Gail indicated to the police that Gartley was an albatross around her neck and insinuated Gartley was responsible for the missing money under investigation. If the true date of the lunch, April 11, had been disclosed to the defense and revealed to the jury, then Gail's testimony that Gartley was the first person she attempted to recruit after her lunch date with Royston would have been far less believable. Had Gail not commenced making plans for the murder until after the April 11 lunch, it is difficult to believe that she first would have approached the man she referred to as an "albatross" around her neck. Gail's explanation would not have seemed plausible once the jury was apprised of the status of Gail's relationship with Gartley after April 11.
Defense counsel's inability to impeach Gail at trial regarding her relationship with Gartley, and the timing of her recruitment of Gartley as the killer, led to another missed opportunity to challenge Gail's credibility. With the information in the date book, the defense could have asserted that Gail would not have turned to Gartley to help her, but instead Gail would have likely turned to the man she was living with at the time, Michael Milligan, for help. As we analyze the impact of this information on the verdict in Mordenti's case, it is important to recall that Gail was not simply just another witness for the State, but was the State's critical witness and the only witness placing Mordenti at the scene of the murder. This information would have allowed the defense to contend that Gail's credibility  contrary to the State's assertions  was, actually, the Achilles heel of the State's case.
Finally, the State's nondisclosure of Gail's date book precluded the jury from being apprised of Gail's entry in her date book from June 7, 1989, the date of the murder, reminding her to call for a ticket for "Michael." Gail testified at the evidentiary hearing that this entry referred to Michael Milligan, not Michael Mordenti. This entry in the date book would have permitted the defense to demonstrate Milligan's possible involvement in the murder, and further support the defense's theory that Gail turned to Michael Milligan, and not Michael Mordenti, when recruiting someone to murder Thelma Royston. In effect, the entry on the day of the murder would have allowed the defense to further chip away at Gail's credibility, which comprised the State's entire case.
In the context of the entire record, as we consider the importance of Gail's credibility and the inconsistencies revealed in the undisclosed date book, we conclude there is a reasonable probability that this evidence "put[s] the whole case in such a different light as to undermine confidence in the verdict." Strickler, 527 U.S. at 290, 119 S.Ct. 1936 (quoting Kyles v. Whitley, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). The date book places Gail's relationships and the timing of those relationships in a whole new context, specifically her relationship with Gartley. The date book also has the potential to cast a different light on whether Michael Milligan was involved in the crime. Entries in the date book on the date of the murder open up a whole new avenue of unanswered questions. The doors opened *173 by the disclosure of this date book should not, and cannot, be left open, particularly in a single-witness case. Therefore, the State's failure to disclose the date book, revealing powerful impeachment of Gail, undermines our confidence in the outcome of this case, and constitutes a Brady violation warranting a new trial.
Next, we turn to Mordenti's second Brady claim. Mordenti asserts that the State's failure to disclose the information obtained from its interview with John Trevena prejudiced Mordenti. Trevena was Larry Royston's attorney. After Royston committed suicide, the State obtained an ex parte order signed by the trial judge stating that the attorney-client privilege did not apply and ordering Trevena to submit to an interview with the State. Copies of this order were only provided to John Trevena and prosecutors Karen and Nicholas Cox.[10] At the evidentiary hearing, Mordenti's trial counsel, Atti, testified that he had no knowledge of the ex parte order or the State's interview with Trevena.
During the evidentiary hearing, the trial court ruled that Trevena's testimony with regard to the information he received from his deceased client in preparation for his murder trial was inadmissible hearsay. However, the trial court permitted postconviction counsel to proffer Trevena's testimony. The proffer indicated that Trevena conveyed to the prosecution that Larry Royston believed that "Gail Mordenti had orchestrated [the murder]." Trevena informed the State that "Mr. Royston had indicated to [him] that [Royston] did have a sexual affair with Gail Mordenti, and that she wanted to continue that affair." Trevena further informed the State that Gail "wanted Mr. Royston freed up so that she could share . . . in his assets." Finally, Trevena communicated to the State that Royston maintained that the thirteen-minute cellular phone call on June 7, 1989, the day of the murder, from Royston to Mordenti was "innocent in nature and that it was relating to some type of a boat or motor vehicle," and "[t]here was no discussion concerning any homicide or violence, . . . it was related to business and... the call had been set up by Gail." The defense was not privy to any of this information.
Initially, it is troublesome for this Court to conceive why the trial court would have signed an ex parte order compelling Trevena to disclose information to the State, without affording the defense counsel the same opportunity. Certainly, due process and fairness dictate that this information judicially ordered to be revealed to the State should have been provided to both sides.
That aside, we turn to the Brady elements, and first examine whether the information obtained by the State from Trevena's interview was favorable, i.e., either exculpatory or impeaching to Mordenti. See Allen, 854 So.2d at 1259. The information revealed in the prosecutor's undisclosed notes of Trevena's interview strongly impeaches Gail. The information disclosed by Trevena provides a substantial basis upon which to impeach Gail concerning her relationship with Larry Royston and the role she assumed in planning Thelma Royston's murder. Moreover, Trevena's conversation with Royston establishes that the thirteen-minute cellular phone call between Royston and Mordenti on the day of the murder was possibly innocent in nature. We conclude that the content of Trevena's conversation with prosecutors is favorable to Mordenti, and *174 therefore, the first Brady prong is satisfied.
We next consider whether the State suppressed the evidence. The State does not contest that the notes of Trevena's interview were in the prosecutor's possession at the time of trial and not disclosed to Mordenti's trial counsel. Therefore, the second Brady prong, that the information obtained from Trevena's interview was suppressed by the State, either willfully or inadvertently, is also satisfied.
Finally, we determine whether the State's failure to disclose this evidence prejudiced Mordenti. To satisfy this prong of Brady, Mordenti must demonstrate that the undisclosed information contained in the prosecutor's notes of Trevena's interview was material, i.e., that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Strickler, 527 U.S. at 280, 119 S.Ct. 1936 (quoting Bagley, 473 U.S. at 682, 105 S.Ct. 3375); see also Allen, 854 So.2d at 1260. We conclude that Mordenti's defense was prejudiced by the State's failure to disclose the information obtained from Trevena's interview.
Assuming without deciding whether the postconviction court erred in determining that Trevena's testimony constituted inadmissible hearsay, we conclude that even if inadmissible it was, at a minimum, relevant information that would have led the defense to discover evidence for the impeachment of Gail. The possible impact of the impeachment would likely have been great given the conspicuous lack of physical evidence linking Mordenti to the murder and that Gail's credibility was the anchor of the State's case. Further, even if Trevena's testimony is hearsay, the details with regard to Gail's romantic involvement with Larry Royston and her role in planning the murder would likely have been admitted for impeachment purposes, not to prove the truth of the matter asserted. See § 90.801(1)(c), Fla. Stat. (2001) (defining hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered to prove the truth of the matter asserted"); see also Peterka v. State, 640 So.2d 59, 68 (Fla.1994).
The withholding of this information by the State precluded Mordenti from defending himself fully and fairly. Our justice system strives to ensure that each party's right to the same information is coterminous. We conclude that information obtained from Trevena's interview casts a different light on the relationship between Larry Royston and Gail, one not revealed to the jury at trial. The State's failure to disclose this information may have also impacted the jury's decision with regard to Gail's credibility.
On the record before us, we cannot plausibly deny the existence of the requisite "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different" and therefore, our confidence in the outcome of Mordenti's case is undermined. Strickler, 527 U.S. at 280, 119 S.Ct. 1936. Therefore, we hold the State's nondisclosure of this favorable information obtained from Trevena's interview prejudiced Mordenti and constitutes a Brady violation.
Notwithstanding whether either one of the State's two Brady violations in this case, standing alone, would be sufficient to remand this case for a new trial, a cumulative analysis weighing the undisclosed, favorable information implicating Brady concerns in conjunction with the asserted misrepresentations to Mordenti's jury involving Giglio violations certainly bolsters our conclusion that Mordenti *175 was prejudiced in this case and is entitled to a new trial. A Giglio claim is based on the prosecutor's knowing presentation at trial of false testimony against the defendant. See Giglio, 405 U.S. at 154-55, 92 S.Ct. 763; Guzman, 868 So.2d at 506. To establish a Giglio violation, it must be shown that (1) the testimony given was false; (2) the prosecutor knew the testimony was false; and (3) the statement was material. See Guzman, 868 So.2d at 505; Ventura v. State, 794 So.2d 553, 562 (Fla.2001); Rose v. State, 774 So.2d 629, 635 (Fla.2000).
Initially, we note that the "materiality" prongs of the Brady and Giglio tests are often confused as one and the same. They are not. This Court recently clarified the two standards and the important distinction between them. See Guzman, 868 So.2d at 506. The Brady standard of materiality is less defense-friendly:
The Brady standard of materiality applies where the prosecutor fails to disclose favorable evidence to the defense. See Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Under Brady, the undisclosed evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). A criminal defendant alleging a Brady violation bears the burden to show prejudice, i.e., to show a reasonable probability that the undisclosed evidence would have produced a different verdict. Strickler v. Greene, 527 U.S. 263, 281 n. 20, 289, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).
By contrast to an allegation of suppression of evidence under Brady, a Giglio claim is based on the prosecutor's knowing presentation at trial of false testimony against the defendant. See Giglio, 405 U.S. at 154-55, 92 S.Ct. 763. Under Giglio, where the prosecutor knowingly uses perjured testimony, or fails to correct what the prosecutor later learns is false testimony, the false evidence is material "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). . . . The State, as the beneficiary of the Giglio violation, bears the burden to prove that the presentation of false testimony at trial was harmless beyond a reasonable doubt. Id. at 680 n. 9, 105 S.Ct. 3375 (stating that "this Court's precedents indicate that the standard of review applicable to the knowing use of perjured testimony is equivalent to the Chapman [v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)] harmless-error standard").
Id. at 506-07 (footnote omitted). Cumulatively, the total picture in this case  the State's Brady violations in failing to disclose Gail's date book and the undisclosed information obtained from Trevena's interview with the State, in addition to other Brady violations where the State failed to disclose information obtained from interviews with key witnesses coupled with misrepresentations by the prosecutor  compels us to grant Mordenti relief in the instant case.
As previously explained, the State's failure to disclose both Gail's date book and the information obtained from the State's interview with Trevena seriously undermine our confidence in the outcome of this case. In addition, the State's failure to disclose an interview with Michael Milligan also causes us some concern. Michael Milligan was Gail's boyfriend in March of *176 1989, and they married on April 20, 1990. More importantly, Michael Milligan was living with Gail at the time of the murder in June of 1989. At the evidentiary hearing, prosecutor Karen Cox identified her handwritten notes documenting an interview of Michael Milligan. Karen Cox's notation reveals: "6/89-Mordenti called him + had car picked up w[hich] was used in bank robbery from New Mexico." At trial, Gail indicated that the car used in the murder was left on the border with Mexico. In this undisclosed statement to Karen Cox, Michael Milligan placed himself in New Mexico, presumably near the Mexico border, at the time that Gail stated the car was being left at that border, and adds context to the June 7th entries in Gail's date book.
With this information, defense trial counsel could have supported its assertion that Gail substituted Michael Mordenti's name for Michael Milligan, which the defense speculated was the real killer. Overall, this information demonstrating that Milligan was at the time of the murder in such close proximity to the vehicle alleged to have been involved in the murder provides additional information regarding Milligan's possible involvement in the murder that was not presented to the jury. This fact would have suggested Milligan's likely involvement and could have contributed to a different outcome in this case.
Further, had the defense obtained information from the State's interview with Gail, which was not otherwise provided to the defense, the jury might have questioned Gail's credibility, the lynchpin of the State's case. Karen Cox's notes indicated that there was at least a romantic tension between Gail and Larry Royston that was discussed in this undisclosed interview. Specifically, the notation states:
He invited her to Tenn.
He said that he did . . . want to date until divorce was over ≠ had time to get head together.
3 or 4 months had a confiding type friendship.
At trial, Gail had testified that her relationship with Larry Royston was strictly a business relationship. The prosecutor's notes undermine Gail's testimony. Information establishing that Gail and Larry Royston had a "confiding type friendship" as opposed to a strictly business relationship as Gail explained to the jury might have led the jury to further question Gail's credibility.
Moreover, the prosecutor's undisclosed notations of Gail's interview also reveals the following information:
Michael made no efforts to sell boat & car
Doesn't think that ever looked for buyers
Larry's boat was a replica of the boat used "on golden pond"
not a high powered speed boat
and
Larry had a boat [which] she was trying to sell it for him $20,000
Larry had rebuilt engines
These notations reveal that Gail communicated to the prosecutor that Royston had a boat for sale and that she was helping Royston procure a buyer. This information is material because the evidence reveals that on June 7, 1989, the day of the murder, Royston and Mordenti had a thirteen-minute cellular phone conversation. Mordenti's position at trial was that he had a discussion with Royston regarding a boat on the day of the murder. This undisclosed notation would have supported Mordenti's assertion that the nature of the phone call was innocent, dealing only with a business transaction. Moreover, this information would have been corroborated by the undisclosed information Trevena *177 communicated to the State, namely that Royston had also maintained that the cellular phone call between Mordenti and himself on June 7, 1989, was "innocent in nature and that it was relating to some type of a boat or motor vehicle." The State's failure to disclose these notations precluded the defense from fairly testing Gail's credibility.
In addition, based on the record before us, the true nature of Gail's immunity may have been misrepresented to the jury. Use immunity forbids testimony to be used against the witness in any criminal prosecution of the witness. See Zile v. State, 710 So.2d 729, 732 (Fla. 4th DCA 1998). Transactional immunity provides complete immunity from prosecution for the matter concerning which the testimony was elicited. See id. Transactional immunity extends further, therefore, because it not only immunizes the witness for any use of his or her testimony or its fruits in a subsequent trial, but it also provides absolute immunity against future prosecution for the offense to which the question relates. See State v. Williams, 487 So.2d 1092, 1094 (Fla. 1st DCA 1986).
At trial, Gail testified, "As long as I told the truth, . . . I had total immunity." The jury may have interpreted this statement to signify that Gail had transactional immunity when she actually only had use immunity. However, Gail also stated at trial she could be sent to jail if she did not tell the truth and "could be an accessory," which the jury could have interpreted as use immunity. At the evidentiary hearing, Karen Cox testified that Gail only had "use immunity." However, at trial Cox did not clarify for the jury what type of immunity Gail had been granted. The nature of Gail's immunity may have impacted how the jury perceived her and evaluated her credibility, thus affecting the judgment. Although standing alone this is insufficient to warrant a new trial, it adds to undermining our confidence in the outcome of Mordenti's trial.
Within our cumulative analysis, we must also consider that at the evidentiary hearing another important witness recanted his trial testimony. See Robinson v. State, 865 So.2d 1259, 1264 (Fla.2004) (addressing whether newly discovered evidence of a codefendant's recantation established that the State committed Brady and Giglio violations). At trial, Horace Barnes testified not only that Mordenti was "in the mob"[11] but also that he saw Mordenti sell a gun to his friend. Barnes testified at the evidentiary hearing that he made the false statements out of anger and in retaliation for Mordenti assisting the FBI in apprehending him for bank robbery. Although on direct appeal we considered the impact of Barnes' single statement that Mordenti was "in the mob" on the outcome of Mordenti's trial, we now know due to Barnes' recantation that his entire testimony was possibly false. The falsity of Barnes' entire testimony could have impacted the jury's determination of Mordenti's character when deliberating.
Accordingly, we reverse the denial of Mordenti's motion for postconviction relief and remand to the trial court for a new trial.

CONCLUSION
In light of our disposition of Mordenti's rule 3.850 appeal, Mordenti's habeas corpus petition is dismissed as moot.
It is so ordered.
*178 PARIENTE, C.J., and ANSTEAD, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
WELLS, J., concurs in result only.
NOTES
[1] This testimony was provided by Horace Barnes. Contrary to the facts depicted to this Court on direct appeal, Barnes was not Mordenti's cellmate but a bank robber whom Mordenti assisted the FBI in apprehending.
[2] Huff v. State, 622 So.2d 982 (Fla.1993).
[3] Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Specifically, Mordenti asserts that the State committed Giglio violations by presenting false evidence and argument with regard to Mordenti's knowledge of Larry Royston, the nature of Gail's immunity, Gail's employment at T & D Auto Repair, Gail's receipt of the gun and bullets from Mordenti, Mordenti's involvement with bank robbers, information with regard to Horace Barnes, prosecutor's notes stating "Don't Mention Rings," and the name of the hotel Gail and Mordenti visited before Mordenti cased the victim's property.
[4] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Mordenti asserts that the State committed Brady violations by withholding evidence that was material and exculpatory in nature, specifically Gail's date book, the State's interview of Michael Milligan, the State's interviews of Gail, information obtained from John Trevena's interview with the State, the name of the hotel Gail and Mordenti visited before Mordenti cased the victim's property, the State's interview of Agent Barry Carmody, information with regard to Tracy Leslie, Gail's grand jury testimony, FBI hair analysis, and FBI metallurgical analysis.
[5] Mordenti asserts eighteen instances where trial counsel was ineffective. Specifically, (1) trial counsel failed to present a Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), objection to law enforcement arranging an encounter between Mordenti and Royston after Mordenti allegedly invoked his Miranda rights; (2) trial counsel failed to object to the introduction of statements made by Mordenti to Gail during the time that they were married; (3) trial counsel failed to object to inadmissible co-conspirator statements; (4) trial counsel failed to discover the true nature of Gail's immunity; (5) trial counsel failed to introduce Gail's prior inconsistent sworn testimony indicating that she obtained possession of the gun and bullets from Mordenti prior to the homicide; (6) trial counsel failed to retain his own metallurgist; (7) trial counsel failed to present available evidence with regard to the thirteen-minute cellular phone call between Mordenti and Royston on the day of the murder; (8) trial counsel failed to adequately prepare for Gail's testimony; (9) trial counsel failed to use available evidence to establish a romantic involvement between Gail and Larry Royston; (10) trial counsel failed to use Gail's statement that Jack Gartley was an albatross around her neck to impeach her credibility; (11) trial counsel failed to talk to the prior defense investigator; (12) trial counsel failed to call alibi witness Lynn Bouchard; (13) trial counsel failed to locate alibi witness Maria Rotering; (14) trial counsel failed to know that Michael Milligan was Gail's live-in boyfriend on March 8, 1990; (15) trial counsel was deficient in cross-examining Horace Barnes; (16) trial counsel failed to present FBI Agent Barry Carmody; (17) trial counsel failed to call Steve Cook; and (18) trial counsel failed to seek a continuance.
[6] Specifically, whether defense counsel's performance was deficient in failing to call FBI Agent Carmody and Dr. Alfred Fireman to testify at trial.
[7] Specifically, whether the lower court erred in summarily denying relief on the following claims: trial counsel's failure to object to the admission of hearsay statements; trial counsel's failure to effectively conduct voir dire; trial counsel's failure to object to the admission of co-conspirator's statements; trial counsel's failure in not objecting to the makeup of the jury; and trial counsel's failure to present evidence with regard to the defendant's good behavior at sentencing as relevant evidence in mitigation of punishment.
[8] John Atti was Mordenti's trial counsel.
[9] Gail verified at the evidentiary hearing that the lunch date had actually occurred on April 11.
[10] Karen and Nicholas Cox are husband and wife. On direct appeal, this Court held that, under the circumstances of this case, no error was created by the fact that the prosecutors were married to each other. See Mordenti v. State, 630 So.2d 1080, 1084 (Fla.1994).
[11] On direct appeal, this Court only addressed whether the trial court erred in permitting Barnes to testify that Mordenti informed him that he was "in the mob." See Mordenti v. State, 630 So.2d 1080, 1084 (Fla.1994). This Court concluded that the claim was procedurally barred, but even if the error was not barred the elimination of this testimony would not have changed the outcome of the proceeding. See id. at 1084-85.