PARIENTE, J., dissenting. I respectfully but strongly disagree with the majority. When a proper cumulative error analysis is performed, there can be no doubt that confidence in .the outcome is undermined .when the newly discovered evidence claim is combined with the multiple Brady claims.[5] While no single claim may rise to the level of requiring .a new trial, the collective import of the errors—discrediting of a key piece of forensic evidence together with the State’s multiple significant failures to produce evidence favorable to the defendantcompels that Smith be granted a new trial. Newly Discovered Evidence Claim 'As to Smith’s newly discovered evidence claim, the State’s comparative lead bullet analysis' (CBLA) expert witnesses- have notv been fully discredited, as has the underlying' science. Yet, at-trial, the State argued that the CBLA proved that the bullet that killed the victim was “materially indistinguishable ... [or] the same” as bullets from a box found at Smith’s uncle’s house, which Smith.had access to, and the chances of finding a box of bullets with the same composition as a box made ten years before “just' boggles the mind.” It does “boggle the mind” that the jury was told that there was solid science linking a particular bullet to Smith when the FBI has since reported that such science can do nothing of the sort. We now know that the FBI has reported CBLA forensic evidence could not be used to determine, for a fact, that any bullet or bullets came from the same box of set produced by the manufacturer. The CBLA evidence was used by the State to prove that ammunition hidden with the gun in Smith’s uncle’s home was the same ammunition used to murder the victim. Indeed, the postconviction court stated, “The evidence linking .the bullet fragment taken from the victim Jeffrey Songer to the ten-year-old gun and box of bullets owned by the Defendant’s Uncle Roy Cone became a feature of the Defendant’s trial. The State emphasized the testimony of the FBI agents as being corroborative of all the other trial-testimony and evidence.” Thus, this evidence; a key forensic pillar upon which the State based the rest of its case, is no longer reliable and weighs heavily in favor of the defendant when considered cumulatively with the Brady claims that follow. Brady Claims As to Smith’s seven Brady claims, and the Eleventh Circuit Court of Appeals’ concerns with this Court’s original failure to perform a cumulative error analysis, I first note that this case, dogs not involve just one Brady claim but, rather, a pattern of multiple failures on the part of the State to disclose evidence that would have been favorable to Smith. .While not one piece of undisclosed evidence, itself, meets the standard for reversal, under Brady, a cumulative error analysis of the claims, coupled with the newly discovered evidence above, compels vacating Smith’s conviction and sentence and remanding this case for a new trial. Cumulative error analysis of all undisclosed evidence is necessary “because the sum of the parts almost invariably will be greater than any individual part.” Smith v. Sec’y, Dep’t of Corrs., 572 F.3d 1327, 1348 (11th Cir. 2009). Indeed, the postconviction court’s order denying Smith relief is replete with statements such as: “This court is troubled by the Brady violations noted by the Eleventh Circuit Court of Appeals”; Melvin Jones “was an important State witness since he was the only eyewitness who-was not involved in the robbery and murder, and both the State and the defense recognized that his credibility was important”; “The evidence that the CBLA testi-' mony has been eroded since the trial and was, in all likelihood, given Undue weight is of concern to the court”; and “The [CBLA] evidence linking the bullet fragment taken from the victim to Jeffrey Songer to the ten-year-old gun and box of bullets owned by the Defendant’s Uncle Roy Cone became a feature of the Defendant’s trial.” A. Melvin Jones As to Smith’s Brady claims, I start with the crucial witness, Melvin Jones, who placed Smith at the scene of the crime. As the postconviction court noted, Jones was the only witness to the crime who was not part of the robbery and murder. ■ The State failed to disclose that at the time of trial “Melvin Jones was not content with the assistance he received from the State for his testimony at the 1988 trial, and told the State that he wanted help with some pending probation violations' and a grand theft change.” Second, Jones, fearing arrest, sought additional help from the prosecutor in exchange for his testimony in Smith’s second trial, to deal with his daughter’s allegation that he sexually abused her. Third, one or more police reports indicated that Jones was initially considered as a suspect in this case in 1983. Fourth, a prosecutor’s note indicated that Jones and Johnson had met briefly in *a holding cell before the 1983 trial. This evidence regarding Jones’ new motivation for testifying in the retrial—that he was testifying in an attempt to avoid arrest and prosecution for sexual abuse allegations—is particularly concerning. Even though the jury was able to consider Jones’ twenty-four prior convictions and that he was hiding from the police On the night of the murder, his new motivation for testifying could have been used to further attack his credibility with the jury. As the Eleventh Circuit stated: Melvin Jones was an important State witness. He was the only eyewitness to the crime who was not involved in the robbery and murder. Both sides recognized that his credibility was important, and the. defense cross-examined him intensely about his motivation to testify at the 1983 trial and about the sentencing break he got for that testimony. At the 1990 trial, however, the defense had nothing to show that Jones had-a motive for testifying against Smith again since the charges he had faced in 1983 were long gone. The State failed to disclose that Jones did have a new reason to curry favor with the proseeution-that he feared he would be charged with a serious crime, that he was looking for help from the prosecutor if his fears were realized, and that he had talked with the prosecutor about it before he testified at the 1990 trial. Smith, 572 F.3d at 1343. Perhaps most disconcerting, the State failed to disclose that Jones and codefen-dant Johnson met in jail before Smith’s 1983 trial. The postconviction court found that the State failed to disclose that on July 11, 1984, “Jones approached Johnson in a holding cell, showed him a map of the crime scene, and offered to help him in connection with the case,” Id. at 1345. The State conceded this information met the first two prongs of Brady but argued that the evidence was immaterial. However, as part of its cumulative analysis, the post-conviction court found: Both Melvin Jones’ and co-defendant’s testimony is weakened by. evidence that they met in jail before the Defendant’s 1983 trial. ... Allegedly, Derrick Johnson reported that Melvin Jones approached him and that he was so unnerved that he immediately called the guards and asked to be removed from the holding cell. Despite knowing there was evidence of collusion before the trial between Jones and the codefendant, during closing arguments: [T]he State emphasized that any suggestion that Derrick Johnson and Melvin Jones colluded was without merit. “Now, was there any testimony from that witness stand that could lead you to believe that Derrick Johnson and Melvin Jones got together and fabricated this testimony in order to pin the [blame on] Derrick Smith? There is no testimony from that stand that they even new[sic] each other on March 23, 1983, other than Melvin Jones saying, I knew him on the street as being New York. Did you socialize with him. No, I just knew of him as New York.” B. David McGruder Further, the State suppressed evidence of another key report that could have been used to impeach State witness David McGruder. McGruder’s testimony was the only testimony that placed Smith at the convenience store during the early morning hour immediately preceding the murder. Police reports and a synopsis of a police interview indicate that Smith was as much as seventy-five pounds heavier than the man McGruder described to police as using the pay phone at the convenience store before getting in the cab with the victim. Clearly this information would have provided powerful impeachment to this eyewitness’s testimony had the State produced the evidence to the defense, as is required. C. Priscilla Walker Finally, there is witness Priscilla Walker, who testified that shortly after the murder Smith returned to her home, told her that he had “shot a cracker in the back,” and remained in her home until 5:00 a.m. The undisclosed evidence, including several law enforcement reports, showed that Walker’s statement to the police about when Smith was at her house conflicted with statements by others about where Smith was during that time, and that Walker had a 1989 shoplifting conviction under the alias Priscilla Smith, which could have also been used to attack her credibility at trial. There was additional evidence suppressed that the police took Walker’s boyfriend, who was living with her at the time, into custody on the night of the murder, thinking he was actually Smith. This evidence could have also been used by the defendant to create reasonable doubt. CONCLUSION I would conclude that when analyzed cumulatively, the Brady .violations and newly discovered evidence, which cast doubt as to the veracity of the testimony of one of the State’s key-witnesses, forensic evidence that became the feature of Smith’s trial and a pillar upon which the State relied, and an additional witness who testified regarding a confession, is sufficient to undermine confidence in the outcome of the verdict of Smith’s trial. A key issue in Smith’s trial was not only whether Smith was present at the crime scene, but whether Smith or the codefendant, Johnson, who was also in the cab, shot the driver. Without the evidence related to Brady claims and the newly discovered evidence relating to the veracity of the CBLA, the State could only prove that Smith had a revolver on the night of the crime; Smith was at the convenience store at some point and left his fingerprint on the public phone; and Smith was planning to “hustle” some money that night. The only eyewitness account of what happened the night of the murder, not attacked by a Brady claim, came from the codefendant in the case, Johnson, who received a plea bargain in exchange for this testimony— hardly a reliable witness. Smith, 572 F.3d at 1330-32. Nine years ago, the Eleventh Circuit Court of Appeals criticized this Court for failing to perform a cumulative error analysis: There is room for debate about whether the Florida Supreme Court performed any cumulative analysis of the favorable evidence it found had been withheld from the defense. See Smith, 931 So.2d at 797-99. However, there is no room for debate about whether that court performed a cumulative materiality analysis of all six of the pieces of favorable evidence we have concluded were withheld from the defense. As we have pointed out, the Florida Supreme Court unreasonably determined that the fact Melvin Jones had talked with the prosecutor before the 1990 trial about his fears that he would be charged with the sexual abuse of his daughter was not impeachment evidence under. Brady. For that reason the court did not consider that evidence in. conducting its materiality analysis, whether that analysis was cumulative or not. It follows that we cannot defer to its decision about whether the withheld evidence was material. Id. at 1348 (emphasis added) (citation omitted). And, although this Court remanded for an evidentiary hearing and cumulative error analysis in Smith v. State, 75 So.3d 205, 206 (Fla. 2011), and the trial court issued a comprehensive twenty-three page order detailing its analysis, this Court now fails to explain why the cumulative errors in this case do not undermine the Court’s confidence in the outcome other than agreeing with the trial court in a cursory manner. See majority op. at 269-70. However, when reviewing Brady claims, it is this Court’s obligation not to simply defer to the trial court, but to perform- a de novo review. See Geralds v. State, 111 So.3d 778, 787 (Fla. 2010) (citing Mordenti v. State, 894 So.2d 161, 169 (Fla. 2004); Way v. State, 760 So.2d 903, 913 (Fla. 2000) (deferring to the court on questions of fact, this Court reviews de novo the application of the law and independently reviews the cumulative effect of suppressed evidence)). This Court has once again failed to perform a proper cumulative error analysis. On the balance of equities, confidence in the outcome is certainly undermined both as to the guilt and certainly as to the penalty phase of Smith’s trial. Accordingly, justice compels this Court to vacate Smith’s conviction and sentence and remand his case for a new trial free from the taint of the flawed forensic evidence, and with a defense armed with the evidence underlying the multiple Brady claims that will considerably weaken each aspect of the State’s case. When the numerous Brady claims are considered cumulatively with the newly discovered evidence claim, justice requires that Smith be_ given a new trial. Accordingly, I dissent. . Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In my view, any other outcome would be a violation of Smith’s constitutional right to due process. See id at 87, 83 S.Ct. 1194. "Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. ... A prosecution that withholds evidence on demand of an accused ... casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice.” Id. at 87-88, 83 S.Ct. 1194.