982 So.2d 710 (2008)
Michael MORDENTI, Appellant,
v.
STATE of Florida, Appellee.
No. 2D05-4407.
District Court of Appeal of Florida, Second District.
February 22, 2008.
*711 James Marion Moorman, Public Defender, and Terri L. Backhus, Special Assistant Public Defender, Bartow, for Appellant.
Bill McCollum, Attorney General, Tallahassee, and Richard M. Fishkin, Assistant Attorney General, Tampa, for Appellee.
HARRIS, CHARLES M., Associate Senior Judge.
The issue in this case is whether the trial court erred in excluding statements made by the alleged coconspirator, deceased at the time of trial, which, if believed by the jury, would exonerate Michael Mordenti. We hold that the trial court did err and reverse.
Mordenti was first convicted of first-degree murder in 1991, at which time he received the death penalty. Mordenti's conviction and sentence was affirmed by the Florida Supreme Court in 1994. However, on review of a denied motion for postconviction relief, that court reversed the conviction and sentence because of a Brady[1] violation. Mordenti v. State, 894 So.2d 161 (Fla.2004). A second trial resulted in a mistrial (hung jury). Mordenti was tried once again, resulting in a second conviction and this appeal.
Larry Royston, the victim's husband, was immediately the prime suspect in the case. Because he had an alibi (he was with the victim's mother at the time of the murder), law enforcement believed a hired killer was involved. Through Royston's telephone records, the police were led to Gail Mordenti Milligan. When she was called in for questioning, Mrs. Milligan demanded immunity for her cooperation, and apparently without any additional investigation, she received it. She then told the investigators that indeed she was the go-between in setting up this murder-for-hire. Royston offered $10,000 for the murder of his wife, and Mrs. Milligan set out to find a contract killer. Mrs. Milligan told authorities that her former husband, Michael Mordenti, after initially refusing, had agreed to do the murder. This was her testimony at trial, and it was the only material evidence against Mordenti.
The Florida Supreme Court in reversing Mordenti's original conviction noted how critical Mrs. Milligan's testimony was in obtaining the conviction:[2]
Mordenti was convicted primarily on the testimony of one woman, Gail Mordenti Milligan. No physical evidence was produced linking Mordenti to the murder, and Gail was the only witness who was able to place Mordenti at the scene of the murder. There was no money trail, no eyewitnesses, no confession, no murder weapon, no blood, no footprints, and no DNA evidence linking Mordenti to the murder. The prosecution's entire case relied solely on Gail's testimony, and the jury crediting that testimony.
894 So.2d at 168.
The testimony in the case indicates that Royston never met Mordenti. This is important *712 because when Royston first saw Mordenti in court, he blurted out to his attorney in a crowded courtroom, "That's not the guy" or "That's not him."[3] This statement, as well as others, was not discovered until after Royston committed suicide shortly before his trial.[4] The prosecutors of Mordenti convinced a judge that Royston's attorney-client privilege ended with his death and obtained an ex parte order requiring Royston's attorney, Trevena, to respond to the State's questions. Although the above quoted courtroom statement was not specifically mentioned, the Florida Supreme Court discussed the importance of Trevena's testimony in its decision overturning Mordenti's conviction:
After Royston committed suicide, the State obtained an ex parte order signed by the trial judge stating that the attorney-client privilege did not apply and ordering Trevena to submit to an interview with the State. . . .
During the evidentiary hearing [on the motion for postconviction relief] the trial court ruled that Trevena's testimony with regard to the information he received from his deceased client in preparation for his murder trial was inadmissible hearsay. However, the trial court permitted postconviction counsel to proffer Trevena's testimony. The proffer indicated that Trevena conveyed to the prosecution that Larry Royston believed that "Gail Mordenti had orchestrated [the murder]." Trevena informed the State that "Mr. Royston had indicated to [him] that [Royston] did have a sexual affair with Gail Mordenti, and that she wanted to continue that affair." Trevena further informed the State that Gail "wanted Mr. Royston freed up so that she could share . . . in his assets." Finally, Trevena communicated to the State that Royston maintained that the thirteen-minute cellular phone call on June 7, 1989, the day of the murder, from Royston to Mordenti was "innocent in nature and that it was relating to some type of a boat or motor vehicle," and "[t]here was no discussion concerning any homicide or violence, . . . it was related to business and . . . the call had been set up by Gail."
Id. at 173 (some alteration in original).
Even though the credibility of Mrs. Milligan was the central issue of this case, the trial court refused to allow Trevena's testimony on the basis of hearsay and privilege. There was simply no privilege remaining at the time of the third trial. If the privilege ever existed (the statement was blurted out in a crowded courtroom for anyone to hear), it was waived when the State inappropriately required Trevena to respond to its questions. The statement then became public information. The Florida Supreme Court made this abundantly clear in its decision. The court did not treat the information as privileged and discussed its potential admissibility. That has become the law of the case as it relates to privilege.
With regard to the application of the hearsay rule, the United States Supreme Court has stated that "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." Chambers v. Mississippi, 410 U.S. 284, *713 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). The uncorroborated statement of a coconspirator raises such concerns. The one who took the money, picked the murderer, and was given immunity must be subject to the closest scrutiny during cross-examination. Mrs. Milligan was not. The Florida Supreme Court discussed the potential problem of hearsay in its decision and suggested it should be available for impeachment of Mrs. Milligan who, for example, had denied a sexual relationship with Royston. Royston's statement also meets the spontaneous statement exception as well as the statement against interest exception to the hearsay rule.
It may well be that the jury will not believe Mr. Trevena or may put some other construction on Mr. Royston's statements. But the jury should have that opportunity.
Reversed and remanded for a new trial.
DAVIS, J., Concurs with opinion.
STRINGER, J., Dissents with opinion.
DAVIS, J., Concurs specially with opinion.
I concur with Judge Harris' conclusion that the trial court committed reversible error in determining that the testimony of the attorney who represented Larry Royston prior to his death was inadmissible in the third Mordenti trial. However, I write to explain why I believe that the attorney-client privilege does not apply in this case.
The issue presented in this case is whether the privilege should now preclude the use of Royston's attorney's testimony given the unique procedural posture presented here. That is, the issue of whether the trial court was correct when it originally determined that the privilege did not apply is not germane to our current review.[5]
The purpose of the privilege is to bar the disclosure of information; it is not a test of admissibility. See § 90.502(2), Fla. Stat. (2006) ("A client has a privilege to refuse to disclose, and to prevent any other person from disclosing, the contents of confidential communications. . . ."); see also E. Colonial Refuse Serv., Inc. v. Velocci, 416 So.2d 1276, 1277-78 (Fla. 5th DCA 1982) (stating that although testimony may be relevant and admissible, the information sought "may be privileged and therefore beyond permissible discovery"). Once it is determined that a privilege does not prohibit the disclosure of information, the question of whether it is admissible is determined by the rules of evidence.
In the instant case, after Royston's death but prior to Mordenti's first trial, the State obtained a ruling from the trial court that Royston's attorney could not assert the privilege to keep from disclosing the conversations he had with this client.[6] Royston's attorney never appealed this ruling, but rather complied by answering the State's questions regarding the information shared with him by his client prior to the client's death.
After discovering that the State had obtained this information but had failed to disclose it to his counsel prior to trial, *714 Mordenti sought postconviction relief alleging a Brady[7] violation. In reversing the postconviction court's denial of relief, the Florida Supreme Court reviewed the information disclosed by the attorney pursuant to the trial court's determination that the privilege did not apply and found that the State had, in fact, committed a Brady violation by not providing the information to Mordenti's counsel. Mordenti v. State, 894 So.2d 161, 174 (Fla.2004). The court granted Mordenti a new trial, impliedly concluding that the defense should be provided the same information that the State had obtained from Royston's attorney. Id. at 177.
Despite the fact that Royston's attorney never sought appellate review of the trial court's determination of the inapplicability of the privilege, the Florida Supreme Court, by ordering the further disclosure of the attorney-client conversation, implicitly affirmed the trial court's determination that the privilege did not apply. Although the privilege issue was not before the supreme court in this postconviction proceeding, the practical effect of the court's order directing that the information again be disclosed to Mordenti's counsel was that the conversations between Royston and his attorney were no longer protected by the attorney-client privilege. Thus, as Mordenti argues on appeal, this became the law of the case, and the trial court erred in determining that the testimony was inadmissible at Mordenti's third trial because of the privilege.[8]See Smith v. City of Fort Myers, 944 So.2d 1092, 1094 (Fla. 2d DCA 2006) ("`The doctrine of the law of the case requires that questions of law actually decided on appeal must govern the case in the same court and the trial court, through all subsequent stages of the proceedings.'" (quoting Fla. Dep't of Transp. v. Juliano, 801 So.2d 101, 105 (Fla.2001))).
Having determined that the attorney-client privilege was not a proper basis to exclude the attorney's testimony, I would further agree with Judge Harris' opinion in concluding that the three portions of testimony at issue were admissible. The spontaneous statement made by Royston to his attorney in open court that Mordenti was "not the guy" would meet the statement against interest exception to the hearsay rule. See § 90.804(2)(c). The other two statements would be admissible as impeachment testimony. See § 90.608. I would therefore concur with Judge Harris that the trial court erred in excluding the testimony and agree that the case should be remanded for a new trial.
STRINGER, J., Dissents with opinion.
I respectfully dissent. I would affirm Mordenti's conviction because Mordenti has not established any reversible error from the trial court's determination that Trevena's testimony was protected by the attorney-client privilege. Let me begin by stating that while the statements at issue would certainly assist in Mordenti's defense, those statements do not amount to a "smoking gun" that would exonerate Mordenti. In order to understand the importance of the statements to Mordenti's defense, a better explanation of the background facts is required. The facts adduced at Mordenti's third trial have not changed substantially from those reported in Mordenti's first appeal by the Florida Supreme Court:

*715 This case involves the murder of Thelma Royston. The victim's husband, Larry Royston (Royston), allegedly hired Mordenti to commit the murder. Royston and Mordenti were charged with the victim's murder after Royston's cellular phone records led detectives to Mordenti's former wife, Gail Mordenti,[[9]] who subsequently confessed that she had acted as the contact person between Mordenti and Royston. After Royston and Mordenti were charged, Royston committed suicide. Consequently, his version of the events at issue was not available. At trial, Mordenti's defense was that he was some place else when the murder occurred.
Testimony at trial revealed the following details regarding the murder. The victim, Thelma Royston, lived with her mother and her husband. On the night of the murder, Royston told the victim that the lights were off in the barn. Because the Roystons' horse business required the barn lights to be left on until 10:00 or 11:00 each night, the victim and her mother went outside to turn on the lights. When they went outside, they noticed an unidentified man off in the distance. The victim went to talk to him and called back to her mother that the man was there to discuss a horse Royston had for sale. The victim's mother went back inside to tell Royston that the man was there, but when her dog began barking she went back out to investigate. Upon doing so, she discovered the victim's body in the barn. The victim had suffered multiple gunshot and stab wounds. Because it was night and the man had been so far off in the distance, the victim's mother was unable to furnish a description of him to the police.
Because the victim suffered multiple gunshot and stab wounds, the medical examiner was unable to determine from which wounds the victim had died or whether she had died instantaneously. However, there were no defensive wounds and no indication that anything had been taken or that the victim had been sexually assaulted.
Additional testimony revealed that the victim and Royston had been contemplating divorce, but that Royston thought the victim was asking for too much money. A former girlfriend of Royston's testified that Royston had asked her to kill his wife by either shooting or stabbing her to make it look like a burglary, but the former girlfriend had refused. Mordenti's former wife, Gail Mordenti, testified that Royston asked her if she knew of anyone who would "get rid of his wife" for $10,000. Gail Mordenti stated that she subsequently asked Mordenti if he knew of anyone who would kill Royston's wife and he responded: "Oh, hell, for that kind of money, I'll probably do it myself." Gail Mordenti explained that she acted as the middle person between Royston and Mordenti by conveying information about the best time and place for the murder and by supplying a photograph of the victim and a map of the ranch.
Gail Mordenti further testified that, when she first approached Mordenti about murdering the victim, he informed her that it would be impossible to commit the murder as Royston wanted and that he would not do it. However, Royston continued to insist to Gail Mordenti that he wanted the murder committed. Gail Mordenti finally placed Royston directly in touch with Mordenti. Royston's cellular phone records reflected *716 that he made a thirteen-minute telephone call to Mordenti's number on the day of the murder. After the murder, Gail Mordenti delivered payments totaling $17,000 from Royston to Mordenti. According to her, the amount had risen from $10,000 to $17,000 because Mordenti had to get rid of a car. Mordenti gave Gail Mordenti between $5,000 and $6,000 of the $17,000 over time to help her pay her bills. Additionally, Gail Mordenti testified that Mordenti described the murder to her, stating that the victim "put up quite a fight" and that he "shot her in the head with a .22." He also told Gail Mordenti that the victim had a lot of jewelry on and that he felt really bad that he couldn't take it. She also testified that Mordenti had a number of guns that he kept as "throw away" pieces and that she knew he was associated with some "shady" people. (A cellmate of Mordenti's also testified that Mordenti told him he was "in the mob.") For her testimony, Gail Mordenti was offered complete immunity.
No physical evidence was produced linking Mordenti to the crime, and Gail Mordenti was the only witness who was able to place him at the scene of the murder. However, her testimony was consistent with what police knew about the murder and some of her testimony matched information about the murder that had not been made public.
In his defense, Mordenti produced three witnesses who stated that he had attended an automobile auction on the night of the murder. Mordenti was a used car dealer and frequently attended auctions where he purchased cars for resale. The prosecution, however, was able to point to a number of inconsistencies in the witnesses' testimony. Additionally, one of the three witnesses was one of Mordenti's girlfriends, and the other two witnesses had testified only after being contacted by the girlfriend over a year after the murder and after being reminded by the girlfriend that the night of the murder was the same night Mordenti had attended the auction.
Mordenti v. State, 630 So.2d 1080, 1082-83 (Fla.1994) (alteration in original). In the appeal of the denial of Mordenti's motion for postconviction relief, the supreme court set forth the statements Royston made to attorney Trevena during the initial proffer as follows:
The proffer indicated that Trevena conveyed to the prosecution that Larry Royston believed that "Gail Mordenti had orchestrated [the murder]." Trevena informed the State that "Mr. Royston had indicated to [him] that [Royston] did have a sexual affair with Gail Mordenti, and that she wanted to continue that affair." Trevena further informed the State that Gail "wanted Mr. Royston freed up so that she could share . . . in his assets." Finally, Trevena communicated to the State that Royston maintained that the thirteen-minute cellular phone call on June 7, 1989, the day of the murder, from Royston to Mordenti was "innocent in nature and that it was relating to some type of a boat or motor vehicle," and "[t]here was no discussion concerning any homicide or violence, . . . it was related to business and . . . the call had been set up by Gail." The defense was not privy to any of this information.
Mordenti v. State, 894 So.2d 161, 173 (Fla. 2004). In his proffer before the court at his third trial, Trevena also explained that Royston did not admit any culpability in the victim's death and insisted that Mordenti also had nothing to do with it. Trevena also acknowledged that Royston blurted out to him in court, "That's not the guy," when Royston saw Mordenti. While *717 Trevena believed this statement may have been an admission that Royston was involved in the offense, Trevena and Royston did not discuss the matter further.
As I previously stated, Royston's statements would certainly assist in Mordenti's defense, but I do not believe that the statements are the equivalent of a "smoking gun" that will exonerate Mordenti. As the trial court below noted, "This is a defendant who's talking to his defense attorney making what are clearly obviously self-serving statements." Nothing Royston said to his attorney proves that Gail Milligan was lying when she testified that Royston hired Mordenti to murder the victim.
Turning to the merits, the majority appears to hold that the State waived the attorney-client privilege when it obtained an ex parte order ruling that the privilege was not applicable to Royston's statements and ordering Trevena to participate in an interview with the State in 1991. However, it was not the State who sought to assert the privilege at Mordenti's third trial in 2005; it was attorney Trevena. Furthermore, the State did not have the authority to waive or assert the attorney-client privilege. See § 90.502(3), Fla. Stat. (2005); Restatement (Third) of the Law Governing Lawyers § 86 (2000).
Moreover, I respectfully disagree with the suggestion in both the majority and the concurring opinion that the trial court's 1991 ex parte ruling that the testimony at issue was not protected by the attorney-client privilege became law of the case when the supreme court reversed the denial of Mordenti's motion for postconviction relief in 2004. The issue before the supreme court was whether the postconviction court erred in denying relief on Mordenti's claim that the State committed a Brady violation by failing to disclose the statements Trevena made at the interview that followed the ex parte order at issue. See Mordenti, 894 So.2d at 173. In order to analyze this issue, the supreme court determined (1) that Trevena's statements in the interview were favorable, (2) that the State suppressed the evidence, and (3) that the State's failure to disclose the evidence prejudiced Mordenti. Id. at 173-74. The supreme court did not have before it the issue of whether Royston's statements to Trevena were protected by attorney-client privilege. The doctrine of law of the case applies only to those issues "`actually decided on appeal.'" State v. McBride, 848 So.2d 287, 289 (Fla.2003) (quoting Fla. Dep't of Transp. v. Juliano, 801 So.2d 101, 105 (Fla.2001) (emphasis added)).
I reject the concurring opinion's suggestion that the supreme court in Mordenti implicitly affirmed the trial court's ex parte ruling that the attorney-client privilege did not apply. It was not necessary for the supreme court to rule on the privilege issue for its determination of whether the State committed a Brady violation in failing to disclose the statements. Furthermore, I do not believe that Trevena had a duty to seek review of the trial court's ex parte order in order to preserve his ability to claim the privilege in a separate judicial proceeding. Without appellate review of the trial court's order, the trial court's order cannot become the law of the case. See McBride, 848 So.2d at 290.
Nor do I believe that publication of Royston's privileged statements by the Florida Supreme Court constitutes a sort of abrogation of the privilege. It is true that the cat is out of the bag, so to speak, and the content of Royston's confidential statements to attorney Trevena has been made public. However, the fact that the information is public does not mean that the information is discoverable for trial. Because the privilege has not been waived by *718 anyone authorized to do so, the fact that Trevena's proffer was subsequently published should not abrogate the privilege.
Finally, I reject the majority's suggestion that Royston may have waived the attorney-client privilege by communicating to his attorney via courtroom "outburst." The majority notes that Royston "blurted out" the communication in a crowded courtroom where he could have been overheard. However, this issue was not raised by Mordenti on appeal, and we are precluded from addressing it for that reason. See Johnson v. State, 660 So.2d 637, 645 (Fla.1995); Grimsley v. State, 939 So.2d 123, 125 (Fla. 2d DCA 2006). Furthermore, there is no evidence that the statement was heard by anyone other than attorney Trevena.
My determination that Mordenti has not established any error in excluding the statements at issue as privileged renders moot a determination of whether the statements constituted inadmissible hearsay. However, I do not share the majority's concern with the application of the hearsay rule "to defeat the ends of justice" in this case. In fact, the admission of a codefendant's self-serving hearsay statements to his attorney, which were made to assist a defense that was seeking to avoid the death penalty and which were not subject to cross-examination, gives me greater concern for the ends of justice.
Accordingly, I conclude that Mordenti has not established any reversible error from the trial court's determination that Trevena's testimony was protected by the attorney-client privilege. Therefore, I would affirm Mordenti's conviction.
NOTES
[1] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[2] Had Mrs. Milligan testified that her boyfriend had committed the murder, there would have been some corroboration because independent witnesses stated that two people were seen in the vicinity of the murder at or near the appropriate time and that while neither met the description of Mordenti, one did meet the description of Mrs. Milligan's boyfriend.
[3] Royston's attorney testified on proffer that Royston had been "adamant that [Mordenti] had absolutely nothing to do with [the murder]."
[4] Suppose Mordenti had been executed following his first conviction and sentence before this information was revealed by the State? What confidence would the public have in the criminal justice system?
[5] I recognize that section 90.508, Florida Statutes (2006), renders inadmissible those disclosures that are erroneously compelled by the court; however, this section does not apply to these facts because the statements here are not sought to be admitted against the holder of the privilege, Larry Royston.
[6] Because the State was the party that sought the ruling originally, an argument can be made that the State should now be collaterally estopped from arguing that the privilege should bar the use of the testimony at the retrial. However, the State does not have standing to assert the privilege. See § 90.502(3).
[7] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[8] As mentioned in Judge Harris' opinion, it is not clear that the privilege was the actual basis for the trial court's ruling. In fact, upon remand, the trial court entered another order directing the attorney to answer the questions of Mordenti's counsel.
[9] Gail Mordenti married sometime after the events at issue and became Gail Milligan.